**DEMOCRATIC PARTY OF THE UNITED STATES, and Edward Mezvinsky, Plaintiffs,**

v.

**NATIONAL CONSERVATIVE POLITICAL ACTION COMMITTEE, et al., Defendants,**

**and**

**Federal Election Commission, Intervenor.**

**FEDERAL ELECTION COMMISSION, Plaintiff,**

v.

**NATIONAL CONSERVATIVE POLITICAL ACTION COMMITTEE, et al., Defendants.**

Civ. A. Nos. 83–2329, 83–2823.

United States District Court, E.D. Pennsylvania.

Dec. 12, 1983.

---

Steven B. Feirson (argued), John M. Coleman, Lisa M. Scottoline, Dechert, Price & Rhoads, Philadelphia, Pa., for Democratic Party of the U.S.; Anthony S. Harrington, Gen. Counsel, Democratic Nat. Committee, Washington, D.C., of counsel.

\* Honorable Edward R. Becker, United States Circuit Judge, Third Circuit Court of Appeals, sitting by designation.

A. Richard Gerber, Gerber, Gerber & Shields, Norristown, Pa., for Mezvinsky.

Robert R. Sparks, Jr. (argued), Sedam & Herge, McLean, Va., Harry C.J. Himes, Himes, Sanders, Bunting & Nolan, Philadelphia, Pa., for NCPAC and FCM.

Lawrence M. Noble (argued), Charles N. Steele, Richard B. Bader, Jeffrey H. Bowman, Federal Election Commission, Washington, D.C., for FEC.

Roger M. Witten (argued), William T. Lake, Deborah M. Levy, Jana B. Singer, Wilmer, Cutler & Pickering, Washington, D.C., Robert F. Stewart, Jr. Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for amicus Common Cause; Ellen G. Block, Common Cause, Washington, D.C., of counsel.

Harold N. Iselin (argued), Philip A. LaCovara, Ronald A. Stern, Hughes, Hubbard & Reed, Washington, D.C., Thomas B. Harvey, Jr., American Civil Liberties Union, Greater Philadelphia Branch, Philadelphia, Pa., for amicus American Civ. Liberties Union; Charles S. Sims, American Civil Liberties Union, New York City, Arthur B. Spitzer, American Civil Liberties Union, Fund of the National Capitol Area, Washington, D.C., of counsel.

Before BECKER, Circuit Judge,\* and GREEN and GILES, District Judges.

BECKER, Circuit Judge.

### TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Preliminary Statement | 801 |
| II. | Procedural History | 802 |
| III. | Justiciability | 803 |
| | A. Statutory Subject Matter Jurisdiction | 803 |
| | 1. The Contentions | 803 |
| | 2. Discussion | 805 |
| | (a) The Evolution of 9011(b) and 437c(b)(1) | 805 |
| | (b) The Legitimacy of Maximum Enforcement | 806 |
| | B. Constitutional Subject Matter Jurisdiction: Standing and Ripeness | 807 |
| | 1. Standing | 808 |
| | (a) The Contentions | 808 |
| | (b) Discussion | 809 |
| | 2. Ripeness | 811 |
| | (a) The Contentions | 811 |
| | (b) Discussion | 812 |

IV. The Merits . 814

A. Introduction 814

B. The Statutory Scheme: Section 9012(f)'s Role in the Fund Act, and FECA 815

C. The Constitutional Protection Afforded the Conduct Barred by Section 9012(f) 816

 1. Analyzing Buckley v. Valeo 816
 (a) Expenditures are Speech 817
 (b) Contributions are only Proxy Speech 817
 (c) Associational Freedoms 817
 (d) The Centrality of Corruption 817
 (e) Examining Corruption 818

 2. Does Section 9012(f) Bar Speech Fully Protected by the First Amendment? 818
 (a) The Contentions 818
 (b) PACs Amplify Individual Speech 819
 (c) Justifying 9012(f) as a Regulation on Corporate Speech 820

 3. Does Section 9012(f) Prevent Corruption or its Appearance? 822
 (a) Scope of Review 822
 (i) The Impact of NRWC 822
 (ii) The Buckley Findings 823
 (b) Plaintiff's Evidence 823
 (i) The Polls 824
 (ii) Patronage Appointments 827
 (iii) Briefings 828
 (iv) The Benefits From Independent Expenditures 829
 (c) Adjudicative v. Legislative Facts 830
 (i) Potential for a Quo 830
 (ii) Potential for a Quid 831
 (d) "Corruption to the Statute" 831

 4. Possible Narrowing Constructions of Section 9012(f) 835
 (a) Control 835
 (b) Advisory Opinions 836

D. The Overbreadth Analysis 837

V. Conclusion 839

# I. PRELIMINARY STATEMENT

Section 9012(f) of Title 26 of the United States Code makes it a crime for a "political committee" to expend more than $1,000 to further the election of nominated presidential or vice presidential candidates who are financing their campaigns with public funds.[1] These consolidated declaratory judgment actions require us to decide whether this provision violates the first amendment guarantees of free speech and association, as recognized and interpreted by the Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and its progeny. Briefly put, *Buckley* held that, while contributions to political candidates were only "proxy speech" subject to moderate constitutional protection, expenditures made on behalf of such candidates were speech fully protected by the first amendment and might be silenced only if they posed a threat of corruption or its appearance.

■ This is not the first time actions such as these have been brought. In *Common Cause v. Schmitt,* 512 F.Supp. 489 (D.D.C.1980), the District Court for the District of Columbia held section 9012(f) to be unconstitutional on its face. That decision was affirmed by an equally divided Supreme Court without opinion. 455 U.S. 129, 102 S.Ct. 1266, 71 L.Ed.2d 20 (1982). Because such affirmances have no precedential authority whatsoever, *see Trans World Airlines v. Hardison,* 432 U.S. 63, 73 n. 8, 97 S.Ct. 2264, 2271 n. 8, 53 L.Ed.2d 113 (1977), the issue is fairly before us. Although we are not in precise accord with the entire reasoning of our District of Columbia colleagues, we echo their ultimate conclusion: section 9012(f) is unconstitutional.

The procedural posture of these suits presents an inversion of the conventional declaratory judgment action in constitutional cases. Usually the plaintiff, needing to overcome the presumption that congressional enactments are constitutional, seeks a declaration of unconstitutionality. The plaintiffs in both of these actions, the Democratic National Committee and Edward Mezvinsky (plaintiffs in No. 83–2329) and the Federal Election Commission (plaintiff in No. 83–2823) seek a declaration that section 9012(f) is constitutional. This procedural anomaly, coupled with the apparent dormancy of section 9012(f) until the sum-

---

1. 26 U.S.C. § 9012(f) (1976) is part of Title VIII of the Revenue Act of 1971, Pub.L. No. 92–178, 85 Stat. 497, 563 (1971), as amended, commonly known as the "Presidential Election Campaign Fund Act" or "Fund Act." The Fund Act establishes a fund out of tax dollars to finance political conventions and the campaigns of nominat- ed presidential candidates of major political parties. It regulates which presidential and vice-presidential candidates are eligible for public funding of their final presidential campaigns. It further regulates the financial practices of candidates receiving public funding.

mer of 1984, when the major parties will select their presidential and vice presidential candidates, impels us to consider *sua sponte* whether the cases are now justiciable within Article III of the Constitution. The action brought by the Democrats and Mr. Mezvinsky, the Chairman of the Pennsylvania Democratic Committee and a voter, also presents another significant procedural problem—whether the group of statutes of which section 9012(f) is a part permits private parties to enforce its prohibitions, or whether it reserves that right exclusively to the Federal Election Commission.

Our methodology in this opinion is as follows. After briefly recounting in Part II the procedural developments in the cases, we address the issue of justiciability, including standing and ripeness, in Part III. We first conclude that 26 U.S.C. § 9011(b) permits private parties such as the Democratic National Committee to bring this declaratory judgment action before this three-judge district court. We so conclude, notwithstanding other statutes that might appear to restrict enforcement powers to the Federal Election Commission. Having found statutory standing, we then turn to the constitutionality of section 9011(b) as applied in this case. We conclude that, based on the unique circumstances of this case, section 9011(b)'s authorization of these actions does not violate the restriction of Article III on federal court jurisdiction to "cases and controversies." We further conclude in Part III that the suits brought by the Democrats and the FEC are ripe for adjudication.

Having found both suits justiciable, we then analyze in Part IV the facial constitutionality of section 9012(f), proceeding along traditional overbreadth lines as set forth in *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). From an examination of the Fund Act, of which section 9012(f) is a part, and of the Federal Election Campaign Act (FECA), a closely related statute, we first determine the type of conduct and speech that section 9012(f) is intended to prohibit. Basing our analysis on an exposition of *Buckley v. Valeo* and a discussion of how subsequent decisions by the Supreme Court may have modified the holdings of that case, we then determine what speech and conduct relating to presidential campaigns Congress may not legitimately prohibit. Because *Buckley* and its progeny allow restrictions on true campaign speech only to prevent corruption or its appearance, we focus on the extent to which conduct barred by section 9012(f) has led to corruption or the appearance thereof in recent political history.

We find that the plaintiffs have produced virtually no evidence of actual corruption and little admissible evidence of the appearance of corruption. We also focus on the potential for the conduct barred by section 9012(f) to corrupt or create the appearance of corruption. We find that, while some extremely large and professionally managed expenditures made independently of the candidate's official campaign may create the appearance of corruption, most of the expenditures banned by section 9012(f) pose no such threat. We then look for a plausible narrowing construction of section 9012(f) that would limit its focus to only those potentially harmful expenditures. We find none. We thus hold that section 9012(f) violates the first amendment to the Constitution because it threatens to chill and to punish much speech that Supreme Court decisions have held to be protected.

## II. PROCEDURAL HISTORY

The first action (No. 83–2329) was filed on May 1, 1983, by the Democratic Party of the United States and Edward Mezvinsky,[2] against the so-called "PAC defendants," the National Conservative Political Action Committee ("NCPAC"), and the Fund for a Conservative Majority ("FCM"). Defendant NCPAC is a nonprofit organization un-

---

2. Unless otherwise indicated, a reference to "The Democrats" in this opinion includes both the Democratic Party and Mr. Mezvinsky.

der the laws of the District of Columbia organized primarily to influence elections by making contributions or by making expenditures either in support of favored (generally conservative) candidates or against disfavored (generally liberal) ones. Defendant FCM is a Virginia corporation and engages in similar activities.

The Democrats, noting that the defendant PACs have announced their intention to spend substantial funds on behalf of President Reagan in 1984, seek a declaration that section 9012(f) of Title 26 of the United States Code is constitutional, at least on its face.[3] Pursuant to 26 U.S.C. § 9011(b)(2), a three-judge court was constituted to hear the case. The PAC defendants moved to dismiss this suit under Fed. R.Civ.P. 12(b)(1) on the theory that the Democrats lacked statutory and constitutional standing to bring the action, and that this court accordingly lacked statutory and constitutional subject matter jurisdiction. They were joined in this motion—at least with respect to statutory standing—by the Federal Election Commission ("FEC"), which intervened as defendants in the case for that limited purpose. The PAC defendants also moved to transfer venue to the District Court for the District of Columbia under 28 U.S.C. § 1404(a) (1976).

The second action (No. 83–2823) was filed on June 14, 1983, by the FEC against the same defendants seeking declaratory relief similar to that ultimately requested by the Democrats. The same three-judge court was constituted to hear the case. Upon

motion by the Democrats and pursuant to Fed.R.Civ.P. 42, we consolidated the two cases for all purposes.

On September 13, 1983, after briefing and supplemental briefing by the parties, we heard extensive oral argument on the pending motions to dismiss and the motion to transfer venue. For the reasons now set out in Part III of this opinion, we denied the motions.

The case was called for final hearing on October 27, 1983. The parties called no witnesses at that time. Instead, they relied on 201 stipulations and three books of related exhibits they had previously agreed upon as the factual record. The parties had developed these stipulated facts during September and early October in the wake of several case management conferences held by Judge Giles, a member of this panel. We received this evidence,[4] and the briefs filed in the case by the parties and amici.[5] We also heard extensive oral argument. We now grant judgment for the defendants for the reasons set out in Part IV of this opinion.

## III. JUSTICIABILITY

### A. Statutory Subject Matter Jurisdiction

#### 1. The Contentions

The Democrats and FEC predicate the statutory subject matter jurisdiction of this three-judge court on 26 U.S.C. § 9011(b).[6]

---

**3.** The Democrats originally demanded injunctive relief against NCPAC and FCM. They then amended their complaint to delete this demand for relief.

**4.** Some of the evidence was received subject to objection as to its admissibility. However, the court did not admit into evidence the results of several polls proffered by the plaintiffs for the purpose of showing the public's perception of corruption stemming from the activities of PACs. *See infra* part IV.C.3(b)(i).

**5.** The court has been materially aided in its deliberations by the briefs and oral argument of two amici, Common Cause, which has aligned itself with the Democrats and FEC, and the American Civil Liberties Union, which has aligned itself with the PAC defendants. We

express our appreciation to the amici for their submissions, which were of extraordinarily high quality.

**6.** The Democrats also claim that federal courts have statutory subject matter jurisdiction of this case under the general federal question statute, 28 U.S.C. § 1331 (Supp V. 1981). While we assume this assertion to be correct, *but cf. Brown v. General Services Administration*, 425 U.S. 820, 834–35, 96 S.Ct. 1961, 1968–69, 48 L.Ed.2d 402 (1976) (noting that specific statutory grants of subject matter jurisdiction can displace more general grants), general federal question jurisdiction is insufficient to permit this three-judge district court to decide the case. This three-judge district court has jurisdiction only by dint of 26 U.S.C. § 9011(b)(2), which

Section 9011(b) allows the FEC, the "national committee of any political party, and individuals eligible to vote for President ... to institute such actions, including actions for declaratory judgment or injunctive relief as may be appropriate to implement or contrue [sic] any provision of this chapter[,]" including section 9012(f). The plaintiffs maintain and the defendants apparently do not challenge the proposition that a declaration of section 9012(f)'s constitutionality would constitute a construction of that provision.

The PAC defendants and the FEC maintain, however, that 2 U.S.C. § 437c(b)(1) (1982), which is part of the FECA, implicitly repeals section 9011(b) and bars anyone but the FEC from enforcing section 9012(f). Section 437c(b)(1), last enacted as part of Title I of the 1979 amendments to FECA, provides:

> The [FEC] shall administer, seek to obtain compliance with, and formulate policy with respect to, this Act and chapter 95 and chapter 96 of Title 26. The Commission shall have *exclusive jurisdiction* with respect to the civil enforcement of such provisions.[7]

(Emphasis added). Both the PAC defendants and the FEC believe that this provision prevents private parties like the Democrats from bringing this action, which they

style as being "one in the nature" of an action for enforcement.

The PAC defendants' and FEC's other argument against statutory subject matter jurisdiction over the Democrats' suit is, in essence, that allowing this private action would subvert the regime of "Judicial Supervision" established by Congress in 2 U.S.C. § 437g (1982) for enforcing FECA and the Fund Act and would substitute a regime of "Maximum Enforcement."[8] The defendants note that section 437g establishes an elaborate, administrative remedy available to private parties who believe that violations of the Fund Act or the FECA are occurring. Section 437g allows private parties to complain to the FEC, which, after exhausting administrative processes, can sue the alleged violators. If the FEC fails to avail itself of these remedies, 437g(a)(8) allows aggrieved parties to sue the FEC in the District of Columbia in order to compel the FEC to pursue a "civil action to remedy the violation involved ...." If the FEC fails to bring such an action, then and only then may the private party sue directly to enforce the FECA or Fund Act. If private parties could sue violators of the Fund Act without exhausting these other remedies, the defendants' argument continues, requiring private parties first to complain to the FEC would be pointless.[9]

---

requires proceedings instituted pursuant to 26 U.S.C. § 9011(b)(1) to be heard "by a court of three judges in accordance with the provisions of section 2284 of title 28, United States Code ...." Thus, the jurisdiction of this court turns on whether 26 U.S.C. § 9011(b)(1) authorizes private parties, such as the Democrats, to bring actions of this nature.

7. Section 9012(f) is included within Chapter 95 of Title 26.

8. The terms "Judicial Supervision" and "Maximum Enforcement" are borrowed from Stewart & Sunstein, *Public Programs and Private Rights*, 95 Harv.L.Rev. 1195, 1208 (1982). Judicial Supervision refers to a system in which only an agency may bring an action to enforce a regulatory norm. If the agency fails, however, to bring such an action, a private party can sue the agency to force it to do so. Under a system of Maximum Enforcement, both private parties and agencies can enforce regulatory norms. Moreover, private parties can initiate actions against the enforcing agency if they believe it has failed to enforce the laws.

9. Another possible objection to the statutory subject matter jurisdiction of this three-judge court—and one initially posed by the court itself—stems from 2 U.S.C. § 437h (1982), part of FECA. That provision states that actions for declaratory judgments to construe the constitutionality of any provision of "this Act" are to be brought before a district court, which is to certify the case to an en banc panel of the circuit court of appeals for that district. If "this Act" as used in § 437h encompassed the Fund Act, then we should have dismissed this case referred to the in banc Third Circuit Court of Appeals. All the parties submit that "this Act" refers exclusively to FECA and that section 437h is thus irrelevant. Their belief is predicated on § 431(19), which states "[t]he term 'Act' means the Federal Election Campaign Act of 1971, as amended." They distinguish cases such as *Clark v. Valeo*, 559 F.2d 642, 645 n. 2 (D.C.Cir.), *aff'd mem. sub nom. Clark v. Kimmitt*, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977), in which the en banc court of appeals heard constitutional challenges to the Fund Act as being, in effect,

The Democrats advance two responses to the defendants' challenge. First, they state that their suit is not an action to *enforce* the Fund Act, but rather to obtain a construction of the Act. Thus, § 437c(b)(1) is inapplicable. Second, they say that the Court should not read § 437c(b)(1) implicitly to repeal § 9011(b). Rather, § 437c(b)(1) should be understood only as divesting other government agencies, which formerly had some responsibility for civil enforcement of the Fund Act, from continuing in that civil enforcement role.

### 2. Discussion

 Interpreted literally, section 9011(b) seems to authorize any voter in the United States to obtain a construction of the Fund Act and to implement its terms. Yet, there is a sharp tension between section 9011(b)'s apparent call for universal standing to enforce the Fund Act and section 437c(b)(1)'s apparent restriction of standing to the FEC alone. Two principles guide us, however, to the conclusion that section 9011(b) authorizes this suit by the present private plaintiffs. First, "[t]he starting point in every case involving construction of a statute is the language itself." *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979). Here the language of the statute itself seems plainly to authorize these plaintiffs to seek a construction of section 9012(f). Second, if there is a conflict between the directives of two statutes, it is the general duty of the court to attempt reconciliation. Implied repeal is the interpretation of last resort. *See Morton v. Mancari*, 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974). Here reconciliation is possible.

### (a) The Evolution of 9011(b) and 437c(b)(1)

The intertwined evolution of the Fund Act and FECA shows that the Democrats'

understanding of section 437c(b)(1)'s limited purpose is plausible. Congress established in the 1971 Fund Act a right of national political committees and individuals eligible to vote for president to sue for injunctive, declaratory or other relief (as appropriate) to "implement or construe" any of its provisions, including section 9012(f). *See* 26 U.S.C. § 9011(b)(1). This right was created to assure public and private fidelity to the substantive norms created by the Act.

Later in 1971, Congress also enacted FECA, in a form substantially different from today's statute. Federal Election Campaign Act, Pub.L. No. 92–225, 86 Stat. 3 (1972). Under the 1971 FECA, the Comptroller General carried out administrative and investigatory duties, *id.* § 308(c)(1), (d)(1), but only the Attorney General of the United States could institute a civil action for violations of the statute's provisions. *Id.* § 308(d)(1).

In the 1974 amendments to FECA, Congress created the FEC to replace the Comptroller General. Federal Election Campaign Act Amendments of 1974, Pub.L. No. 93–443, § 208, 88 Stat. 1263 (1974). It invested the FEC with administrative and investigatory duties, and with some civil enforcement powers. To make clear its intent to divest the Comptroller General and the Attorney General of most of the powers they had held under the 1971 Act, Congress stated that the "Commission has primary jurisdiction with respect to the civil enforcement" of the Act. *Id.* § 310(b). The 1974 amendments to FECA left significant enforcement power in the hands of the Attorney General, however. Under the newly added sections 314(a)(6) and 314(a)(7), for example, if the FEC believed a violation of the FECA or of certain criminal provisions situated in Title 18 of the United States Code to be occurring, it was

---

exercises of "pendent jurisdiction" by those courts, for in those cases, the circuit courts were presented with challenges to both FECA and the Fund Act and heard the case in conjunction with a three-judge court. We agree with the

parties and confess that our initial concerns were misplaced. Section 437h is not relevant to the cases before us now because we deal only with a construction of the Fund Act.

obliged to request the Attorney General to bring appropriate civil-injunctive or criminal actions.

In the 1976 amendments to FECA, Congress finally centralized that all governmental civil enforcement of the Act in the FEC. According to the legislative history of the new amendments, under the 1971 Act and 1974 amendments:

> enforcement responsibility was fragmented, and the line between improper conduct remediable in civil proceedings and conduct punishable as a crime blurred .... [Therefore] the Committee concluded that it was appropriate to simplify and rationalize the present enforcement system.

H.R.Rep. No. 917, 94th Cong., 2d Sess. 3, U.S.Code Cong. & Admin.News 1976, p. 929. Congress accomplished its goal by repealing the criminal provisions formerly situated in Title 18 of the United. States Code, *see* Federal Election Campaign Acts of 1976, Pub.L. No. 94–283, § 201(a), 90 Stat. 496 (1976), by essentially reenacting those provisions as part of FECA itself, *see id.* § 112, and by authorizing the FEC itself to bring civil actions to stop violations of FECA, *see id.* § 109. In keeping with this desire to consolidate governmental enforcement responsibilities, Congress used the word "exclusive" in what would be codified as 2 U.S.C. § 437c(b)(1). *See id.* § 101 (amending what was then section 309(b) of FECA, which established the powers of the FEC).[10] In view of this history, it would appear that section 437c(b)(1) was enacted by Congress to make clear that only the FEC, and no other *governmental* authori-

ty, would have jurisdiction to enforce the two Acts.

(b) *The Legitimacy of Maximum Enforcement: Conclusion*

Congress' establishment of Maximum Enforcement regimes elsewhere in the law damages the FEC's implicit argument that Congress could not conceivably have wanted Maximum Enforcement here. It is simply not correct to maintain that, because it makes a private right of initiation less important, Maximum Enforcement makes no sense. In adopting the Fund Act, Congress could reasonably have concluded, as it did in enacting a provision the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1270 (Supp V. 1981), a provision of the Energy Policy and Conservation Act, 42 U.S.C. § 6305 (1976 & Supp V. 1981), and of the Clean Air Act, *id.* § 7604, that a right of private initiation is a useful supplement to a private right of action in assuring fidelity to a regulatory norm.

Moreover, we note that Congress explicitly ceded the opportunity—which it took advantage of with respect to the FECA—to create a regime of Judicial Supervision rather than one of Maximum Enforcement. In 2 U.S.C. § 437d(e) (1982), a section of FECA distinct from § 437c(b)(1), which we herein construe, Congress stated that suits brought by the FEC would be the only method for enforcement of FECA aside from the limited private right of initiation contained in section 437g. Apparently, and contrary to its behavior regarding numerous other provisions of FECA, Congress chose not to extend this provision of FECA to cover the Fund Act as well.[11]

---

**10.** In 1980 the language of section 437c(b)(1) was changed to eliminate the word "primary," Pub.L. No. 96–187, 105(6), Title I, Jan. 8, 1980, 93 Stat. 1354, 1366. This change from "primary exclusive" to "exclusive" eliminates what appears to be redundant language.

**11.** This differing treatment of private rights of action under the Fund Act and private rights of action under the FECA are possibly justified by a perception that agency enforcement proceedings after attempts at conciliation, *see* 2 U.S.C. § 437g(a)(4)(A), or private rights of initiation followed either by agency enforcement or pri-

vate action, *see* 2 U.S.C. § 437g(a)(8)(A), (C), are too slow to effectively secure adherence to the substantive norms of the Fund Act during the critical period between July or August (the months of the presidential nominating conventions) and election day in November. We acknowledge, however, that this justification finds no specific support in the legislative history and that private rights of initiation may also prove too slow to deal with late-breaking violations in non-presidential elections. *Cf. Durkin for U.S. Senate Committee v. FEC,* 2 Fed.Elec.Camp.Fin. Guide (CCH) ¶ 9147 (D.N.H.1980) (denying writ of mandamus to force FEC to hurry enforce-

In view of the foregoing discussion, we hold that private plaintiffs have the statutory right to bring suit under section 9011(b) to obtain a construction of the Fund Act.[12]

### B. Constitutional Subject Matter Jurisdiction: Standing and Ripeness

■ It is a commonplace of modern federal practice that before adjudicating the merits of a dispute, a court must find that the proposed relief actually benefits the litigant complaining in some "concrete" way. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 42–43, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976); *Linda R.S. v. Richard D.*, 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d

536 (1973). Concomitantly, the court must also find that the conduct of the defendant injures or threatens injury to the plaintiff. This injury need not be to a recognized legal interest, *see Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), but it must be more than harm to a state of affairs that the complaining party pleads merely to be desirable, *see Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

■ In cases where the harm is only threatened, plaintiffs must pass another barrier before courts may constitutionally address their case on the merits and award them relief. Courts must find that the

---

ment of FECA, but recognizing deficiency of FECA in not permitting rapid resolution of violations occurring in critical period just before election).

**12.** Our holding is fully consistent with numerous cases cited by the FEC wherein courts have denied private rights of action under FECA. *See Durkin for U.S. Senate Committee v. FEC*, 2 Fed.Elec.Camp.Fin.Guide (CCH) ¶ 9147 (D.N.H. 1980); *Walther v. FEC*, 82 F.R.D. 200, 202 (D.D.C.1979); *Walther v. Anderson*, 2 Fed.Elec.Camp. Fin.Guide (CCH) ¶ 9085 (D.Minn.1979); *Walther v. Biden*, 2 Fed.Elec.Camp.Fin.Guide (CCH) ¶ 9084 (D.Del.1979); *In re Federal Election Campaign Act Litigation*, 474 F.Supp. 1044 (D.D.C. 1979); *Walther v. Barnett*, 474 F.Supp. 1051 (D.D.C.1979); *Walther v. Baucus*, 467 F.Supp. 93, 94 (D.Mont.1979); *Common Cause v. FEC*, 82 F.R.D. 59, 60 (D.D.C.1979). We agree with those courts that 2 U.S.C. § 437d(e) bars private rights of action with respect to FECA, but, for the reason stated in text, we do not believe that this doctrine should be extended to the Fund Act. *Cort v. Ash*, 422 U.S. 66, 74–76, 95 S.Ct. 2080, 2086, 45 L.Ed.2d 26 (1975) and *Gabauer v. Woodcock*, 594 F.2d 662, 673 (8th Cir.), *cert. denied*, 441 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979), also cited by the FEC in support of its position, are likewise distinguishable. Both deal with attempts at enforcement, whereas this suit by the Democrats instead seeks only a construction or declaration. Moreover, neither *Cort* nor *Gabauer* deals with an attempt to enforce the Fund Act. And both suits involved attempts to imply rights of action from a since-repealed criminal statute. Here we have an express private right of action.

We must note, however, that our holding today rests in considerable tension if not outright opposition to that of the District of Columbia Circuit in *In re Carter-Mondale Reelection Commit-*

*tee, Inc.*, 642 F.2d 538, 542–43, 545 n. 9 (D.C.Cir. 1980), which read the legislative history of section 437c(b)(1) to preclude private plaintiff suits under the Fund Act, at least suits to stop the FEC from certifying a presidential candidate as eligible to receive federal funding of his campaign. Although the court's reading of the House Report concerning the 1976 amendments to FECA is thoughtful, we believe the court there erred by focusing too narrowly on the language of the report and insufficiently on the plain language of section 9011 as well as the limited scope of 2 U.S.C. § 437d(e). Indeed, it was this failure to consider the explicit provisions of the Fund Act that prompted Judge Wald's powerful concurrence in the case. *Id.* at 548, 549 n. 2.

Our holding is also incompatible with that of the three-judge district court in the almost-identical case of *Common Cause v. Schmitt*, 512 F.Supp. 489 (D.D.C.1980), *aff'd by an equally divided court*, 455 U.S. 129, 102 S.Ct. 1266, 71 L.Ed.2d 20 (1982). There the court dismissed for lack of statutory subject matter jurisdiction a claim brought by a private plaintiff, Common Cause, apparently to enforce the ban of the Fund Act on expenditures by political committees. As did the court in the *Carter-Mondale* litigation, the district court reasoned that section 437c(b)(1) allowed only the FEC to enforce the Fund Act. *See Schmitt*, 512 F.Supp. at 502–03 & n. 55. Although we believe this understanding of section 437c(b)(1) is incorrect, it is also important to note that lack of statutory subject matter jurisdiction was but an alternative holding by the court there. The *Schmitt* court also relied on the failure of Common Cause to state a cause of action against the PACs; the proscriptions cited by Common Cause in their pleadings barred actions only by candidates, not by independent political committees. 512 F.Supp. at 503.

case is "ripe," that is, that the need for a current adjudication outweighs the dangers of adjudication based on an incomplete factual record or on circumstances that may never eventuate.

These requirements of Article III rest in imperfect harmony with the availability of declaratory relief, which appears only to allow a court to advise the parties to the litigation of its point of view on a particular matter. Ever since *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937), however, it has been settled that declaratory relief is not unconstitutional per se. Courts nonetheless have an obligation in each case legitimately seeking declaratory relief under a statute or other provision to ensure that the requirements of Article III are met.

### 1. *Standing*

#### (a) *The Contentions*

The PAC defendants argue that the Democrats lack Article III standing to bring a declaratory judgment action.[13] They contend that none of the conduct in which they have engaged or may engage harms the Democrats. Their supplemental brief, filed in response to questions propounded by the court, is clear and concise:

> [The Democrats] complain that defendants are trying to persuade voters to vote for Ronald Reagan and against the nominee of the Democratic Party. That is true. It is also politics. But it is not the sort of direct and palpable injury to plaintiffs which confers Article III standing.

They then argue that, even if the conduct of the PAC defendants cognizably injures plaintiffs, a finding that section 9012(f) constitutionally allows the judiciary to stop such conduct does the private plaintiffs no good. As private parties, plaintiffs lack power to bring a criminal prosecution under 9012(f); only the attorney general can do that. And, whatever may be their power to "implement or construe" the Fund Act through actions brought under section 9011(b), private parties, the PAC defendants say, have no power under that statute or any other to enforce by means of civil injunction the criminal prohibitions of section 9012(f); that remedy is left to the FEC alone. 2 U.S.C. § 437d(a)(6). Finally, it is submitted that even if the FEC's civil enforcement process might ordinarily be benefitted (through stare decisis or issue preclusion) by a judgment for the private plaintiffs in their action, the FEC's seeking of almost identical relief in a consolidated action renders this factor irrelevant.

The Democrats have several responses to this forceful attack upon our constitutional jurisdiction. To show injury in fact, they cite the recent Supreme Court cases of *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982), and *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), for the proposition that, while courts normally have power to determine whether a claimed hurt creates the "injury in fact" needed to confer standing on the complaining party and jurisdiction upon the court, Congress has considerable power to override these determinations. The Fund Act's plain language, the argument continues, coupled with a reading of its legislative history, reveals that Congress considered any uncertainty surrounding interpretation of the Fund Act itself injurious to entities such as national political parties, which must understand the system of finance in which they seek electoral support. The Democrats seemingly recognize that this putative justification for standing may override the case or controversy requirement of Article III and authorize purely advisory opinions. They therefore also argue that, because the PAC defendants are threatening to violate section 9012(f) on a massive scale and thereby subvert the system of public finance created by the Fund Act, a failure to adjudicate this case will leave them unable to know how to go about best raising funds for the

---

**13.** The PAC defendants concede that the FEC has constitutional standing to bring this action. The court chooses, however, to consider this issue *sua sponte*. *See infra* note 17.

presidential election in 1984. The Democrats add that, at all events, the likely attacks of the PAC defendants upon the Democrats' nominee threaten judicially cognizable injury.

With respect to the redressability of any injury suffered, the Democrats argue that a ruling by the court that section 9012(f) is not unconstitutional on its face would facilitate future enforcement of the Fund Act, particularly in view of the short interval between political conventions and elections. Congress authorized enforcement, in section 9011(b), they say, by giving private parties the right to "implement" the provisions of the Fund Act by means of injunctive relief.

(b) *Discussion*

█ Counsel has not brought to our attention any other case that has dealt with the issue of Article III standing in actions brought to uphold the constitutionality of suspect statutes. The only other suit of which we are aware in which a party even sought such relief is this suit's elder sibling, *Common Cause v. Schmitt*, 512 F.Supp. 489 (D.D.C.1980), *aff'd by an equally divided court*, 455 U.S. 129, 102 S.Ct. 1266, 71 L.Ed.2d 20 (1982). There, the district court never reached the constitutional standing issue, because it found equitable relief to be inappropriate with respect to one count of the complaint by the private plaintiff and (we think erroneously) found no statutory standing with respect to a second count of the complaint involving an attempt by the private plaintiff to enforce the Fund Act.

Whether private plaintiffs have standing in this declaratory judgment action turns largely on whether private plaintiffs may ultimately enforce the provisions of the Fund Act, including section 9012(f), by means of civil injunction actions brought during the final presidential campaign. If so, a judgment here that section 9012(f)'s substantive prohibitions are not unconstitutional on their face clears the way for rapid adjudication of disputes arising under section 9012(f), and thus benefits the plaintiffs. Through principles of issue and claim preclusion, the requested declaratory judgment would eliminate the complex defense of facial unconstitutionality that might otherwise bog down subsequent enforcement litigation and prevent both private plaintiffs and the FEC from enjoining spending that violates section 9012(f) before its attendant damage is irreversibly wreaked during the brief period between party conventions and the election.[14] We conclude that, by significantly heightening the practical effectiveness of statutory remedies, the declaratory judgment sought here is capable of surmounting the redressability requirement of Article III.[15]

Although the issue is far from clear, we believe that section 9011(b)'s language, which allows private plaintiffs to bring injunctive actions "to implement" any provisions of the Fund Act, authorizes private plaintiffs to seek civil injunctions during the final presidential campaign to stop spending that violates section 9012(f). While we recognize that the word "to implement" is not identical to the word "enforce," and that Congress used the latter term when granting the FEC the right to bring injunctive actions to stop violations of the Fund Act, *see* 2 U.S.C. § 437d(a)(6), the verb "to implement" surely compasses

---

**14.** There is, of course, no problem with effectively requiring possible defendants to raise the defense of facial unconstitutionality in this court rather than in a direct enforcement proceedings. *See Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

**15.** Although their concessions are not binding on this court, which has an independent obligation to consider whether Article III standing exists, *Smith v. Spina,* 477 F.2d 1140 (3d Cir. 1973), it is worth noting that the PAC defend-

ants appear to accept the legitimacy of the theory that heightening the efficacy of a later statutory remedy may serve as the basis for standing in a predicate declaratory judgment action. The PAC defendants accept that the FEC has constitutional standing in its suit against them; yet the FEC's constitutional standing would seem to rest only upon the ability of a declaratory judgment to heighten the effectiveness of later enforcement actions brought by them under 2 U.S.C. § 437d(a)(6) or 26 U.S.C. 9011(b).

enforcement actions. Webster's defines the verb "to implement" as being "to carry out ... to give practical effect to and to ensure of actual fulfillment by concrete merits." *Webster's Third New International Dictionary* 1134 (1961). An action for injunctive relief to ensure compliance with section 9012(f)'s ban on expenditures by political committees in support of eligible presidential candidates would certainly give practical effect to and ensure actual fulfillment of section 9012(f) by concrete measures. We can find no warrant to strip "implement," as used in section 9011(b), of its ordinary meaning. We thus conclude that a declaratory judgment is capable of benefitting the private plaintiffs here in a judicially cognizable fashion.

We now turn to the question whether there is a judicially cognizable injury to the plaintiff stemming from the PAC defendants' threatened conduct. We hold that there is a threatened injury. To begin with, we take judicial notice that the political power of the Democratic Party depends significantly on whether its nominee comes to occupy the White House. Thus, speech that reduces the likelihood of its nominee's victory injures the Democratic Party in more than an ideological way. The speech of PACs may be politics and it may be protected by the Constitution, but, like any other speech, it can also hurt.

In addition, the uncertainty surrounding the constitutionality of section 9012(f) may injure the Democrats (though not plaintiff Mezvinsky) by compelling them to expend fund-raising and administrative resources in anticipation of the result of enforcement litigation brought against the PAC defendants during the final presidential campaign. If section 9012(f) is struck down in that enforcement litigation, PACs will be able to spend as they please. Under such circumstances, the Democrats might choose to forgo public financing of their own campaign and would have been best advised to focus on private fund raising before the conventions for use thereafter. If section 9012(f) is upheld in enforcement litigation, however, PAC spending will be all but banned. The Democrats might have done better, then, to focus their fund raising efforts on the pre-convention period, when the Fund Act is not in force. Thus, either the Democrats must expend administrative and fund raising resources in anticipation of either eventuality or take a tremendous gamble in anticipation of what they regard as the most likely result. A declaratory judgment now spares them this dilemma.[16] Thus, we believe that section 9011(b) is constitutional insofar as it gives statutory standing to the private plaintiffs in this action.[17]

---

**16.** We also believe that the plaintiffs also have constitutional standing under the principles announced in *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 109–15, 99 S.Ct. 1601, 1612–15, 60 L.Ed.2d 66 (1979), and *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). In those two cases, the Supreme Court held that the Fair Housing Act was constitutional to the extent that it conferred a private right of action on all members of a sufficiently cohesive community whose housing had been segregated in violation of the statutory norms of the Act to remedy such violations. Although the community at issue here—the nation—is considerably broader than that to which the Supreme Court permitted standing to be accorded in *Gladstone* and *Trafficante*, so too is the potential geographic impact of the prohibited practices. Illegal spending anywhere in the nation has the potential to affect voters everywhere.

**17.** The FEC also has constitutional standing to bring this lawsuit. Its ability to enforce the

Fund Act is significantly aided by a declaratory judgment that section 9012(f) is not unconstitutional on its face. Although a declaration to that effect would not prevent the PAC defendants from arguing that the statute was unconstitutional as applied, it would nonetheless greatly simplify and expedite the enforcement process by clearing away a complex issue that might otherwise bog down proceedings. Further, the FEC may have standing to bring this lawsuit on the grounds that the judgment in *Common Cause v. Schmitt*, which establishes that section 9012(f) is unconstitutional, strips away the good faith immunity of its officials under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), that might otherwise serve as a defense to a *Bivens* action in the event they attempt to enforce the provision. *But cf. Yaselli v. Goff*, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), *aff'g*, 12 F.2d 396 (2d Cir.1926) (giving absolute immunity to federal prosecutors).

While so holding, we underscore the narrowness of our determination. We stress that, but for the centrality of the issues decided today to the orderly functioning of the Republic, the extraordinarily short time available between the party nominating convention and the election, and the celerity with which speech can be transmitted through media, doing damage in a hurry and before a case can be decided, we might well have come to a different conclusion. The normal "remedy" for agencies or private parties wishing to enforce constitutionally questionable statutes is still to attempt enforcement. The constitutionality of the statute—at least as applied—will, in almost all other cases, be vindicated by a judgment adverse to a defendant interposing a constitutional defense.[18]

### 2. Ripeness

### (a) The Contentions

The PAC defendants' contention that the suit by the Democrats is not ripe rests on what they regard to be the significant possibility that the illegal spending feared by the Democrats may never come about.[19] Although the defendants have announced their intention to raise funds for President Reagan, they point out that by choice or chance Ronald Reagan, the candidate they now support, might not be the nominee of the Republican Party. They also point out that the opinions of their own organizations might change with respect to President Reagan.[20]

The Democrats respond that, because the passage of time will not produce facts capable of enhancing this court's evaluation of section 9012(f)'s constitutionality, because PAC spending either for Reagan or against its nominee will injure its candidate seriously before a lawsuit could proceed to injunctive relief, and because any waste of judicial resources caused by adjudication of a dispute that may never eventuate is outweighed by the harm resulting from the

**18.** There is one more procedural problem, which, though not raised by any of the parties, is nonetheless important at least to air. It may perhaps best be classified as a problem of indispensable parties. Litigation over the facial constitutionality of a statute is, in significant respects, inherently a true class action; through stare decisis alone, decisions in such cases can affect the rights and interests of individuals and associations not formally parties to the litigation. Yet not all disputes are formally certified as a class action under Fed.R.Civ.P. 23.

In the conventional action to declare a statute facially unconstitutional, we do not worry that the failure to follow the ritual of Fed.R.Civ.P. 23 will unconstitutionally prejudice unnotified absentees, cf. Mullane v. Central Hanover Bank & Trust, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), or absentees not adequately represented by the parties, cf. Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). We assume those wanting the statute upheld and those wanting it struck down are adequately represented. The government or its agencies, which are generally an adequate representative of those seeking to uphold the statute, are usually a party to such suits, and, under 28 U.S.C. § 2403 and Fed.R.Civ.P. 24(c), are notified of such suits and have a right to intervene in instances where they are not a party. The energy required to prosecute a facial constitutional challenge usually assures the court that those opposing the statute are adequately represented. In actions such as these to declare a statute facially constitutional, however, the worries must be greater. There is little assurance that the defendant selected by the government or private plaintiff to oppose the facial constitutionality of the statute will be an adequate representative of others opposing the statute's facial constitutionality. In this case, however, we do not believe that we need formally certify this case as a defendant class action in order to go forward. The PAC defendants, which are sizeable organizations represented by extremely competent counsel, have shown themselves to be worthy champions of those speaking against section 9012(f). The participation of the American Civil Liberties Union as an amicus has also assuaged any worries we had concerning adequacy of representation.

**19.** For reasons not entirely clear to the court, the PAC defendants have waived ripeness objections to the suit brought by the FEC, even though the ripeness problem in that suit is virtually identical. Of course, this waiver is valid only to the extent that ripeness is not a constitutional barrier to justiciability.

**20.** On September 13, 1983, for example, the day of oral argument on these issues, the Philadelphia Inquirer reported that NCPAC was threatening to cancel its plans to raise $5 million towards President Reagan's reelection to protest the United States government's alleged lack of firmness in response to the Soviet downing of Korean Airlines Flight 007.

failure to adjudicate that dispute now, this case is ripe.[21]

### (b) *Discussion*

There is no tidy formula for determining when the main battles of a dispute lie so far in the future that its present adjudication in court constitutes a violation of Article III's requirement that federal courts adjudicate only cases and controversies. The Supreme Court has counseled that "[t]he basic inquiry is whether the 'conflicting contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract,'" *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (quoting *Railway Mail Association v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945). The very vagueness of its proffered standard demonstrates, however, the verity of its prior confession that "[t]he difference between an abstract question and a 'case or controversy' is one of degree, of course, and is not discernible by any precise test." *Id.* 442 U.S. at 297, 99 S.Ct. at 2308.

■ Nonetheless, it is clear from Supreme Court case law that a court must consider several factors in determining whether the Article III minima are satisfied. First, the court must consider the extent to which present adjudication will necessarily deprive the court of facts that are of critical relevance to thoughtful disposition of the legal issues in the case and that only the future might reveal. *See Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634–2635, 57 L.Ed.2d 595 (1978); *Regional Rail Reorganization Act*

*Cases,* 419 U.S. 102, 143–48, 95 S.Ct. 335, 358–61, 42 L.Ed.2d 320 (1974). Second, the court should consider the extent to which its failure to adjudicate will, as a practical matter, deprive the litigants of an effective and peaceful resolution of the battle that looms ahead. *Duke Power,* 438 U.S. at 81–82, 98 S.Ct. at 2634–2635. Finally, although we are hardly certain that this is an Article III requirement rather than simply a rule of prudence, a court should consider the extent to which it might waste its valuable dispute-resolving and peacekeeping resources by adjudicating disputes that never erupt rather than devoting its energies to the hot spots of the legal landscape.

■ After consideration of these factors, we are of the belief that this suit is ripe. As will be shown in our resolution of the merits, a determination of the constitutionality of section 9012(f) turns on virtually no adjudicative facts. And the relevant legislative facts, *e.g.,* conclusions about the perceptions of corruption resulting from PAC expenditures and the relationship of section 9012(f) to effective speech by individuals and associations, are as available now as they will be a year hence during the heart of the final presidential campaign.

Indeed, what will not be available a year from now is the time to think carefully about the constitutional issues involved. With fidelity to our mandate under section 26 U.S.C. 9011(b)(2), we have attempted to "cause the case to be in every way expedited," yet the need to resolve preliminary matters such as those addressed in part III of the opinion, the necessity for some discovery, the development of a factual record, and the effort involved in resolving the difficult constitutional and jurisprudential issues inevitably implicated in actions

---

21. Amicus Common Cause buttresses this assertion by arguing that, if disaffection of the PAC defendants for President Reagan or President Reagan's failure to run for reelection renders this case moot between the time we issue a decision and the time (it presumes) the Supreme Court hears it on appeal, our decision will not become a derelict. Under *United States v. Munsingwear,* 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950), "[t]he established practice of this Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss." *See County of Los Angeles v. Davis,* 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, 1384 n. 6, 59 L.Ed.2d 642 (1979). *But see infra* note 23.

of this sort, has consumed over six months from the filing of the first complaint. We believe we would have been hard pressed to resolve thoughtfully a case of this complexity and import and to give effective relief—including the critical preliminary injunction—if this suit were brought during the heat of a campaign. And if hearings on the case were delayed until after the 1984 political conventions, it is unlikely that the Supreme Court would be able to definitively resolve the issue in time to affect the 1984 presidential campaign. *But see New York Times Co. v. United States* (The Pentagon Papers Case), 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Supreme Court deciding prior restraint case with extreme speed). Adjudication of this case now is critical to a definitive resolution of the important issues presented and, had we found section 9012(f) constitutional, would have been critical to an effective remedy being provided the plaintiffs. *Cf. Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973) (modifying usual mootness analysis for cases "capable of repetition, yet evading review").

Finally, while we confess our discomfort about basing judicial decisions on our own subjective assessment of the future course of American politics, we cannot blind ourselves to reality. As of this date, it is certainly more than speculation that Ronald Reagan will be the presidential nominee of the Republican Party and that, as he did last time and as every other major party candidate has done since the enactment of the Fund Act, will accept public funds for his campaign.[22] It is also more than speculation that the PAC defendants will support President Reagan by making expenditures in violation of section 9012(f). They have said repeatedly that they intend to do so. Moreover, even if President Reagan is not the nominee, the PAC defendants may well spend heavily on behalf of the Republican nominee or against the Democratic nominee. Thus, while it is always possible that the defendants here will not violate section 9012(f), that possibility is also, in our view, sufficiently unlikely to render imprudent our decision to devote judicial resources to resolution of this dispute.[23] We conclude, therefore, that both the suit brought by the Democrats and the suit brought by the FEC are ripe under Article III of the Constitution.[24]

**22.** The ripeness issue would be considerably more difficult if the defendants here proposed to support a non-incumbent.

**23.** In our determination of ripeness, we do not rely on the possibility that the subsequent mootness of this dispute and vacatur of our judgment pursuant to the *Munsingwear* line of cases, *see supra* note 21, significantly reduces the harmfulness of our adjudication of an unripe dispute. To begin with, any such holding by this court based upon such a notion has the potential to subvert the ripeness requirement itself, something the Supreme Court has never done. Moreover, the fact that our decision would, under such circumstances, be stripped of its precedential value points all the more to our having wasted our resources on the dispute in the first place.

**24.** The PAC defendants also moved to transfer venue pursuant to 28 U.S.C. § 1404(a) (1976) to the District of Columbia. When examined in light of the facts of this case, we find the PAC defendants' justifications for a transfer of venue to be unpersuasive. The PAC defendants failed to advise us that they would be calling any witnesses, *see Atlantic Richfield, Co. v. Stearns-Roger, Inc.,* 379 F.Supp. 869, 871–72 (E.D.Pa.

1974), and, in fact, like all other parties in the case, never did call any witnesses. The only evidence submitted were documents, which could be fitted in a large briefcase and transported easily and cheaply from the District of Columbia area to Philadelphia, the site of the proceedings. This mobility of evidence argues against transfer of venue. *See* C. Wright, A. Miller & E. Cooper, 15 *Federal Practice & Procedure* § 3853, at 278 & n. 2 (1976) (citing cases). The ease of transportation between the District of Columbia area and Philadelphia also obviates any serious inconvenience to the PAC defendants arising out of the need of their counsel to attend hearings here.

Another reason offered for transferring venue to the District of Columbia is that it allows the plaintiffs to forum shop and subvert the finality of the judgment in *Common Cause v. Schmitt.* We believe, though, that the defenses of res judicata and collateral estoppel in their traditional forms adequately protect the defendants from any subversion of judgments that might result from our refusal to transfer venue. These defenses are inapplicable here. Defendant FCM expressly waived any res judicata or collateral estoppel defense it might have against the FEC stemming from the 1980 decision in

## IV. THE MERITS

### A. *Introduction*

 We now turn to the question whether or not section 9012(f) is unconstitutional on its face.[25] Our analysis on this matter is in terms of the first amendment overbreadth doctrine. As initially denominated in *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), and as refined in *Broadrick v. Oklahoma*, 413 U.S. 601, 608, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973), that doctrine requires us to strike down a statute if a substantial portion of the conduct it prohibits, taking permissible narrowing constructions of the statute into account, is protected by the first amendment. The polar case of overbreadth is, of course, facial invalidity. Under such circumstances, all (or almost all) of the conduct the statute bars is constitutionally protected.

 The theory behind the overbreadth doctrine, which is unusual in that it allows individuals to challenge what government says in its statutes rather than what government does pursuant thereto, *see generally* Note, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. 844 (1970), is well understood. The very existence of a statute may chill protected expression of vital importance to this nation's exercise in popular sovereignty. *See Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965). "[P]ersons contemplating privileged action which collides with a law may be discouraged from testing the constitutional issue, though their claim to immunity would presumably be vindicated if they proceeded in the teeth of the statute and were set upon by the state." Note, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. at 854; *accord Broadrick v.*

*Oklahoma*, 413 U.S. at 612, 93 S.Ct. at 2915. The chill is too high a price to pay to permit the normal case-by-case process to carve a statute down to a constitutionally permissible form.

Overbreadth analysis essentially relies on a spatial metaphor. It literally envisions the conduct proscribed by a statute to encompass some area and then inquires into whether a sufficiently substantial portion of that area also lies in a constitutionally protected zone. But, of course, neither the verbal prohibitions of a statute nor physical instances of conduct are genuinely spatial. Implicit, therefore, in any overbreadth analysis is some sort of theory that assigns area to statutory prohibitions or instances of conduct.

Because of the requirement that we translate statutory prohibitions and conduct into the idiom of overbreadth, that doctrine leaves us with two tasks in this case—tasks that structure the remainder of our opinion. In section IV.B., we define the contours of the statute in question, 26 U.S.C. § 9012(f). To determine the most essential prohibitions of section 9012(f)—and, to continue the metaphor, to determine which prohibitions are assigned the most area—requires an initial understanding of that provision's place in the acts of Congress to which it is most intimately related: the Fund Act and FECA.

Section IV.C. conducts the second task. It assesses in light of *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and its progeny, what conduct now found to be within the coverage of section 9012(f) Congress may (and may not) legitimately bar. The first subsection analyzes the *Buckley* case itself, long a landmark and trouble spot on the legal landscape. That analysis suggests that two factors are of paramount importance in determining

---

*Common Cause v. Schmitt.* Res judicata and collateral estoppel generally do not apply to the other parties, because they were not parties to that litigation. The transfer of venue is not necessary.

**25.** Section 9012(f) has been the subject of some commentary in periodical literature. *See* Adamany, *PAC's and the Democratic Financing*

*of Politics*, 22 Ariz.L.Rev. 569 (1980); Claude & Kirchhoff, *The "Free Market" of Ideas, Independent Expenditures, and Influence*, 57 North Dakota L.Rev. 337 (1981); Note, *The Constitutionality of Regulating Independent Expenditure Committees in Publicly Funded Presidential Campaigns*, 18 Harv.J.Legis. 679 (1981).

the constitutionality of campaign finance regulation: whether the statute bars speech fully protected by the first amendment (subsection 2), and whether the statute protects against corruption or its appearance (subsection 3). This last subsection in turn requires a detailed examination of the evidence adduced by plaintiffs relating to the existence *vel non* of campaign-expenditure-related corruption in the Reagan administration.

Finally, in section IV.D. we evaluate whether the statute is in fact unconstitutionally overbroad.

### B. *The Statutory Scheme: Section 9012(f)'s Role in the Fund Act, and FECA*

To understand the contours and focus of section 9012(f), it is essential to have an overview of the statutes governing the financing of presidential election campaigns. Section 9012(f) of title 26 of the United States Code is part of the "Fund Act," a set of statutes establishing a fund out of tax dollars to finance political conventions and campaigns of nominated presidential candidates of major political parties. *See supra* note 1. Although only "major party" candidates are eligible to spend money from the fund, no presidential candidate is "eligible" for public funding unless he chooses to accept public funding.

Eligibility for public funding under the Fund Act brings into play a number of regulatory provisions, many of which are contained in the various subsections of section 9012. By examining these provisions, we may determine what section 9012(f) is not designed to regulate. Section 9012(f) is not intended to prohibit eligible candidates (and the national committees of the parties that selected them) from spending money other than out of the publicly established fund. That goal is taken care of by section 9012(a), the constitutionality of which has been upheld.[26] *Republican National Committee v. FEC*, 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980), *aff'g mem.*, 487 F.Supp. 280 (S.D.N.Y.) (limit held constitutional because candidate's acceptance of public funds is voluntary). Nor is section 9012(f) designed to prohibit eligible candidates and their authorized committees from accepting contributions to defray "qualified campaign expenses," a term that 26 U.S.C. § 9002(11) defines to be expenses incurred by the candidate, his running mate or by an authorized person to further one's campaign or that of a running mate. That goal is met by section 9012(b),[27] which is presumably constitutional under *Buckley*, which upheld similar restrictions, 424 U.S. at 23–35, 96 S.Ct. at 636–642.

While these last two subsections of section 9012 deal with expenditures by, or contributions to, eligible candidates, section 9012(f), the text of which is set out in the margin,[28] deals with an entity known as a

---

**26.** 26 U.S.C. § 9012(a)(1) reads:
It shall be unlawful for an eligible candidate of a political party for President and Vice President in a presidential election or any of his authorized committees knowingly and willfully to incur qualified campaign expenses [defined in § 9002(11) ] in excess of the aggregate payments with which the eligible candidates of a major party are entitled under section 9004 with respect to such election ....

**27.** 26 U.S.C. § 9012(b)(1) reads:
It shall be unlawful for an eligible candidate of a major party in a presidential election or any of his authorized committees knowingly and willfully to accept any contribution to defray qualified campaign expenses ....

**28.** Section 9012(f) reads as follows:
(1) Except as provided in paragraph (2), it shall be unlawful for any political committee which is not an authorized committee with respect to the eligible candidates of a political party for President and Vice President in a presidential election knowingly and willfully to incur expenditures to further the election of such candidates, which would constitute qualified campaign expenses if incurred by an authorized committee of such candidates, in an aggregate amount exceeding $1,000.
(2) This subsection shall not apply to (A) expenditures by a broadcaster regulated by the Federal Communications Commission or by a periodical publication, in reporting the news or in taking editorial positions, or (B) expenditures by any organization described in section 501(c) which is exempt from tax under section 501(a) in communicating to its members the views of that organization.
(3) Any political committee which violates paragraph (1) shall be fined not more than

"political committee," which section 9002(9) defines to mean "any committee, association or organization (whether or not incorporated) which accepts contributions or makes expenditures for the purpose of influencing or attempting to influence the nomination or election of one or more individuals to Federal, State, or local elective public office." Section 9012(f)(1) generally prohibits political committees, as thus defined to "incur. expenditures to further the election of [eligible] candidates, which would constitute qualified campaign expenses if incurred by an authorized committee of such candidates, in an aggregate amount exceeding $1,000." Section 9012(f)(2) carves out three exceptions to this spending prohibition. The thousand-dollar limit on campaign expenditures does not apply to entities definable as political committees if they are also regulated broadcasters, periodical publications, or organizations (generally charitable ones) exempted from federal income taxation under 26 U.S.C. § 501(c) and 26 U.S.C. § 501(a). Section 9012(f)(3) makes violation of Section 9012(f)(1) a criminal offense, punishable by fine and imprisonment.

In assessing both the meaning and constitutionality of section 9012(f) of the Fund Act, it is also essential to understand that its primary purpose is not to stop expenditures by political committees made in consultation with (or otherwise coordinated with) the eligible candidate's official campaign. The Federal Election Campaign Act, which regulates elections for federal office generally, and 2 U.S.C. § 441a in particular, accomplishes that task. Section 441a(a)(1)(A) prohibits "persons," defined in section 431(11) to include "an individual, partnership, committee, association, corporation, labor organization, or any other group of persons,"[29] from making "*contributions*" to candidates for federal office, including the presidency and vice presidency, exceeding $1,000. "Contributions," as

used in section 441a is a term of art, however, and includes some payments commonly thought of as expenditures. Section 441a(a)(7)(B)(i) states that "expenditures in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate." For purposes of this opinion, these contribution/expenditures shall be referred to as "coordinated expenditures."

The prohibition of 2 U.S.C. § 441a against coordinated expenditures thus leaves section 9012(f) of the Fund Act with its greatest impact on what the FECA refers to in section 431(17) as "independent expenditures." It must be noted, however, that section 9012(f) also affects regulation of coordinated expenditures. Until the presidential candidate is receiving public funding under the Fund Act, the FEC can seek only civil remedies against those making coordinated expenditures. After the presidential candidate is receiving public funds, however, section 9012(f) also renders coordinated expenditures subject to criminal penalties.

### C. *What Conduct Within the Scope of Section 9012(f) May Congress Bar*

#### 1. *Analyzing Buckley v. Valeo*

Having determined the scope and emphasis of section 9012(f), we now turn to the issue of what conduct within the scope of section 9012(f) Congress may legitimately prohibit. Resting heavily on *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the PAC defendants argue that section 9012(f) is facially unconstitutional. We thus believe it helpful to begin with an analysis of what *Buckley* held and did not hold.

*Buckley* dealt with a multifaceted constitutional attack on numerous provisions of

---

$5,000, and any officer or member of such committee who knowingly and willfully consents to such violation and any other individual who knowingly and willfully violates paragraph (1) shall be fined not more than $5,000

or imprisoned not more than one year, or both.

**29.** Thus, section 441a covers political committees such as the defendant PACs.

the Fund Act and FECA as they then existed. Most relevant to the analysis here is the Supreme Court's disposition of various challenges to limits contained in FECA on the amount that individuals could contribute to campaigns ($1,000 to any single candidate and no more than $25,000 overall) and the amount that individuals could spend on their own, "relative to a clearly identified candidate" ($1,000). The Supreme Court struck down the expenditure limitations as a violation of the first amendment but upheld the limits on contributions against first amendment attack.

### (a) Expenditures are Speech

*Buckley* held that limits on expenditures were limits on speech:

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.

424 U.S. at 19, 96 S.Ct. at 634 (footnote omitted).[30]

### (b) Contributions are only Proxy Speech

The *Buckley* court sharply differentiated between the constitutionality of limitations on expenditures and limitations on contributions:

> By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communi-

cation .... [T]he size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.

*Id.* at 20–21, 96 S.Ct. at 635 (footnote omitted). The speech inherent in contributions has since been termed "proxy speech."

### (c) Associational Freedoms

The *Buckley* Court noted that both contribution and expenditure limitations impinge on the associational freedoms recognized in cases such as *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The expenditure limitations were most serious, however, because they "preclude[d] most associations from effectively amplifying the voice of their adherents, the original basis for the recognition of First Amendment protection of the freedom of association." *Id.* 424 U.S. at 21, 96 S.Ct. at 635. Contribution limits still allowed the contributor to become a member of an association or "to assist personally in the association's efforts on behalf of candidates." *Id.*

### (d) The Centrality of Corruption

If not from the *Buckley* opinion itself, it is clear from the interpretation of that case

---

**30.** In his dissent, Justice White denied that limitations on expenditures were direct limitations on speech.

> Since the contribution and expenditure limitations are neutral as to the content of speech and are not motivated by fear of the consequences of the political speech of particular candidates or of political speech in general, this case depends on whether the nonspeech

interests of the Federal Government in regulating the use of money in political campaigns are sufficiently urgent to justify the incidental effects that the limitations visit upon the First Amendment interests of candidates and their supporters.

424 U.S. at 259–60, 96 S.Ct. at 745–46 (White, J., dissenting).

in *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), that the prevention of corruption and its appearance provide the only legitimate basis for regulating speech resulting from campaign finance. It is no longer permissible to justify campaign finance regulation on grounds that it mutes the voices of the affluent and thereby equalizes the ability of all citizens to affect the outcome of elections. Nor is it still permissible to justify financing limits as a way of braking rising costs of political campaigns. Contribution limits were warranted, the court said in *Buckley,* because the integrity of our system of representative democracy would be undermined if large contributions were given to secure a political *quid pro quo.* 424 U.S. at 26–29, 96 S.Ct. at 638–639. And even if there were no actual *quid pro quo,* Congress could also legitimately regulate campaign finance on grounds that confidence in government might be undermined if the people erroneously believed corruption resulted from a campaign finance method. *Id.* at 27, 96 S.Ct. at 638.

### (e) *Examining Corruption*

The *Buckley* court examined on its own the ability of each campaign finance limitation to thwart corruption [31] and found limits on contributions tightly tailored to anti-corruption goals. It had problems, however, with using the proffered anti-corruption goal as a basis for justifying limits on expenditures. It rejected the argument that, because coordinated expenditures had the same potential for corruption (or its appearance) as contributions, the expenditure limitation imposed by FECA could be upheld. Under FECA, the Supreme Court noted, coordinated expenditures were treated as contributions. The FECA expenditure limit thus really prohibited only "express advocacy of candidates made totally independently of the candidate and his campaign." *Id.* at 47, 96 S.Ct. at 648. Yet these independent expenditures might

prove counterproductive or valueless. Consequently, there was much less danger of a quid pro quo.

### 2. *Does Section 9012(f) Bar Speech Fully Protected by the First Amendment?*

#### (a) *The Contentions*

■ The PAC defendants' substantive argument (and that of amicus ACLU) goes as follows. According to *Buckley,* expenditures by political committees constitute speech protected by the first amendment. Political committees exist as a conduit to permit persons of limited means, but of like ideological persuasion, to combine their modest contributions in a way that enables them to multiply the effects of their own speech and to be heard in this media-dominated world. As the Supreme Court realized in *Buckley,* effective speech takes a lot of money; only by pooling money with others can the average citizen disseminate a message other than one premixed by the major political parties. Section 9012(f)'s bar on expenditures thus seriously diminishes the ability of the average citizen to speak effectively in electoral campaigns.

Truly independent expenditures, the type section 9012(f) is most intended to bar, *see supra* part IV.B., do not, the argument continues, create a threat of corruption or a reasonable threat of its appearance. The Supreme Court made this fact clear in *Buckley* by striking down a bar on independent expenditures. Since deterrence of classical corruption in the form of a *quid pro quo* (or its appearance) is the only permissible reason to limit speech, and since fear of corruption is not a legitimate reason to uphold the constitutionality of section 9012(f), that provision must fall as unconstitutional.

The Democrats, the FEC, and amicus Common Cause make several arguments that criticize this "simple" theory of the *Buckley* case. One set of arguments at-

---

**31.** Whether this scrutiny of Congressional goals withstands the Court's subsequent decision in *FEC v. National Right to Work Committee*

*(NRWC),* 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982), is a subject we shall examine. *See infra* part IV.C.3(a)(3).

tempts to distinguish *Buckley* on its facts from the case at bar. A second set attempts to construe *Buckley* in light of subsequent Supreme Court decisions.

We begin our analysis by treating the plaintiffs' attempts to distinguish the expenditure limit involved in *Buckley* on the grounds that it barred groups and individuals from spending money on behalf of a candidate. Section 9012(f) by contrast leaves individuals and some associations free to spend as much as they please; only "political committees" are barred. Organization as a "political committee" is not necessary to effective speech, the plaintiffs argue; individuals and entities unregulated by section 9012(f) may still effectively carry their messages to the public.

In attempting to show the ability of individuals and groups to speak without resort to the "political committees" whose conduct is limited by section 9012(f), the Democrats point to the following "facts."[32] They note that purchase of a sixty-second spot on Philadelphia's most popular radio station during the most popular listening time costs only $400. In areas of lesser listenership or on stations of lesser magnitude, radio advertising is considerably cheaper. In the Scranton-Wilkes Barre area of Pennsylvania, for example, a sixty-second spot costs but $20.

The Democrats also assert that average individuals or small groups can afford the traditionally more expensive media, television and newspapers. According to an uncontradicted affidavit from a putative expert, the Democrats say that the average cost of a thirty-second spot on a popular network morning news program is only $450 for broadcast in Philadelphia. A network prime-time thirty-second spot costs $4,000. Newspaper advertisements that are two columns wide and five and a quarter inches high costs from $1,400 per day in the *Philadelphia Inquirer*, to only $60 per

day in a paper of lesser circulation such as the *Easton Star-Democrat*.

### (b) *PACs Amplify Individual Speech*

We reject the proposition that in today's high-priced economy individuals will be able to speak as effectively with a thousand-dollar limit on the political committees they form as they would without such limitations. Perhaps the single most telling piece of evidence in favor of our perception concerning the efficacy and importance of political speech by PACs is the number of individuals who contribute to them. According to stipulated facts, during the 1979 election cycle, 101,000 people voluntarily parted with an average of $75, relinquished the opportunity to organize on a small scale and purchase small advertisements saying exactly what they wanted in the *Easton Star-Democrat*, forebore the opportunity to draft and narrate a radio spot for airing on a few small town radio stations, and instead gave their money to NCPAC. According to similarly stipulated facts, another 100,000 citizens gave average contributions of $25 to defendant FCM.

These contributors realized, or certainly should have realized, that they had little control over the PAC's immediate use of their money. They knew that they would not draft the advertisements or decide on whom the money would be spent. They did know, however, that the defendant PACs were sending a message that they liked and one that they wanted others to hear. These citizens believed that, given the economies of scale inherent in modern advertising, and the abilities of professionals to persuade more powerfully, their voice is louder when spoken by a PAC.

While we are not saying that 100,000 NCPAC contributors can't be wrong, we will want far more evidence than plaintiffs have begun to offer before we allow even Congress to stifle so many citizens' preferred method of expression. Those who

32. The evidentiary status of these "facts" is somewhat doubtful. They derive largely from an affidavit by Sheldon Scharfberg, the president of a Pennsylvania advertising agency. While the defendants have put forth no evidence that anything said by Mr. Scharfberg is incorrect, they have not stipulated to his expertise in this area. Nonetheless, we shall assume for purposes of this opinion that Mr. Scharfberg is correct in his assertions.

choose to contribute to political committees rather than spend the money themselves are making a mature choice that Congress must respect absent some compelling countervailing consideration. Without irrefutable evidence that these citizens are wrong, or without some compelling countervailing principle recognized by the Supreme Court, we dare not render ineffective their method of expression. In short, we agree with the PAC's contentions that PAC speech is amplified individual speech presumptively entitled to full constitutional protection.

### (c) *Justifying 9012(f) as a Regulation on Corporate Speech*

The plaintiffs also contend that we should distinguish between the impact of section 9012(f) on the speech of individuals and its effect on the speech of conglomerate or corporate organizations such as the defendant political committees. They continue that, because many PAC contributors have no control over the material put forth by the PACs, and because such material is slickly "professional," any restraint on the speech of individuals caused by section 9012(f) is only a restraint on the "proxy speech," which the Supreme Court has repeatedly held subject to lesser first amendment protections than "true speech" with a complex message. *See Buckley*, 424 U.S. at 20–21, 96 S.Ct. at 635. The only restraint on true speech resulting

from section 9012(f) is a restraint on corporate speech, the plaintiffs conclude, and such restraints are permissible under the Supreme Court decisions in *FEC v. National Right to Work Committee (NRWC)*, 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1983), and *California Medical Association v. FEC (CMA)*, 453 U.S. 182, 101 SCt. 2712, 69 L.Ed.2d 567 (1982). Indeed, they imply that *NRWC* has overruled *Buckley*.

We reject the proposition that *NRWC* and *CMA* undermine our conclusion that section 9012(f) stifles political debate protected by the first amendment absent some compelling countervailing consideration. It is true that in those cases the Supreme Court stated that Congress could regulate the speech of individuals in formal association differently than that of individuals alone.[33] It is also true that certain language in the *NRWC* case suggests that Congress has significant powers to regulate the speech of corporations such as those of the PAC defendants here. But we believe that several factors caution against extension of the language and holdings of those two cases to the facts of the case at bar.

One major factor distinguishing *NRWC* and *CMA* from these cases emerges from a simple examination of the facts in the cases. Neither *NRWC* nor *CMA* dealt with an expenditure limit. *CMA*, most of which

---

**33.** *But see First National Bank of Boston v. Bellotti*, 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978) ("If the speakers here were not corporations, no one would suggest that the State could silence their proposed speech. It is the type of speech indispensible to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. The inherent work of speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.") (footnotes omitted). *See also id.* at 784–85, 98 S.Ct. at 1420 ("In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue. *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 [92 S.Ct. 2286, 2290, 33 L.Ed.2d 212] (1972)"); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 102 S.Ct. 434, 437, 70 L.Ed.2d 492

(1981) ("The Court has acknowledged the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues."); *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly.").

These latter cases are consistent with an interpretation of *Buckley* that sees the opinion there focusing not so much on the first amendment rights of the speaker, but on the right of the public to receive information and ideas. *See Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982) (plurality opinion); *id.* at 2812 (Blackmun, J., concurring).

was a plurality opinion, dealt with the constitutional right of political committees to contribute to entities known as multipolitical committees, political committees which support candidates for several offices. The *NRWC* case dealt with the constitutional right of corporations without capital stock to solicit funds from persons other than pre-existing members.

Nonetheless, the plaintiffs correctly note that a unanimous Supreme Court justified the solicitation limits at stake in *NRWC* by analogizing to the related and constitutionally justified ban on corporations spending money in support of candidates. The key quotation follows:

> The first purpose of § 441b, the government states, is to ensure that substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization should not be converted into political 'war chests' which could be used to incur political debts from legislators who are aided by the contributions. *See United States v. United Automobile Workers*, 352 U.S. 567, 579 [77 S.Ct. 529, 535, 1 L.Ed.2d 563] ... (1957). The second purpose of the provisions, the government argues, is to protect the individuals who have paid money into a corporation or union for purposes other than the support of candidates from having that money used to support political candidates to whom they may be opposed. *See United States v. CIO*, 335 U.S. 106, 113 [68 S.Ct. 1349, 1353, 92 L.Ed. 1849] ... (1948).

We agree with the government that these purposes are sufficient to justify the regulation at issue.

103 S.Ct. at 559.

Notwithstanding this quotation, the justifications offered by the Supreme Court in *NRWC* do not fully apply to the statute at issue here. The first justification offered, one that may well have been necessary to the holding in that case, speaks only in terms of corporate *contributions*. The concern is that large corporate contributions to candidates will corrupt. *Accord Buckley v. Valeo*. But, as we have seen, section 9012(f) is not concerned with contributions. Its major focus is independent expenditures. Unless the plaintiffs can demonstrate that independent expenditures have the same corrupting potential as contributions or coordinated expenditures, the language of *NRWC* is inapplicable.

The second justification offered in *NRWC* also is not fully applicable to the case at bar. Where the ideology of a political committee is clear, and where there is no pre-existing, potentially coercive corporation-employee or union-employee relationship between the contributor and the receiving organization, there is little danger that the money of contributors will go to support candidates they oppose.[34] While this justification might authorize Congress to bar political committees from soliciting funds without disclosing whom they intend to support, it is not capable of justifying the wholesale restrictions on speech created by section 9012(f).

**34.** Of course, it may well be that there was also little danger of such coercion in the *NRWC* case itself. The National Right to Work Committee is, as we understand it, an ideological organization. Unlike corporations or unions with primarily economic goals, it would seem to have little ability to coerce its members into making contributions ultimately used for candidates its members do not support. If the National Right to Work Committee terminated the membership of those who refused to go along with its spending plans, the terminated members would hardly be hurt. Thus, the Supreme Court may have had different views about the coercive potential of non-profit, largely voluntary organizations such as the PAC defendants here, in which case this basis of ours for distinguishing *NRWC* is

incorrect. We believe, however, that the Supreme Court was making a broader point about the legitimacy of Congress' banning contributions by corporations and the permissibility of Congress' failure to differentiate between corporations without capital stock that solicit from members, and ordinary corporations soliciting from stockholders and employees. *See NRWC*, 103 S.Ct. at 560 ("While § 441b restricts the solicitation of corporations and labor unions without great financial resources, as well as those more fortunately situated, we accept Congress' judgment that it is the potential for such influence that demands regulation. Nor will we second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.")

Most importantly, *NRWC* is distinguishable in that it dealt with corporations, a creature of positive law that has traditionally been treated as sui generis. We read *NRWC* as a corporations case. As 26 U.S.C. § 9002(9) makes clear, however, political committees need not be incorporated. Any "committee, association, or organization (*whether or not incorporated*) which accepts contributions or makes expenditures for the purpose of influencing or attempting to influence the nomination of election of one or more individuals to federal, state or local elective public office" runs afoul of section 9012(f).

In sum, we do not read NRWC as overruling *Buckley* or as disturbing the result we reach here.[35] Accordingly, we remain firm in our belief that, as a matter of law, *see Connick v. Myers*, —— U.S. ——, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983), the expenditures barred by section 9012(f) are fully protected speech.

### 3. Does Section 9012(f) Prevent Corruption or Its Appearance?

Our conclusion that an independent expenditure by a political committee is speech strongly protected by the first amendment does not end our inquiry into the permissibility of section 9012(f). The first amendment is not an absolute; a sufficiently compelling reason, such as preventing corruption of government or preventing the appearance of corruption, can justify some abridgements. Analysis of this question must be preceded, however, by a clarification of our "scope of review" over previous findings by Congress and the Supreme Court concerning the corruptive potential of the conduct banned by section 9012(f).

#### (a) Scope of Review

#### (i) The Impact of NRWC

The plaintiffs argue that *NRWC* overrules or further explains *Buckley* to the extent that the latter allowed the courts to examine whether Congress was correct in fearing corruption from a given practice. The argument is, in essence, that in *NRWC* the Supreme Court adopted the position of Justice White in his dissent in *Buckley* that unelected judges should defer to the expertise of elected legislators in determining whether specified campaign practices have the potential to corrupt. *See* 424 U.S. at 261, 96 S.Ct. at 746. The key quotation cited from the *NRWC* opinion is: "Nor will we second guess a legislative determination as to the need for prophylactic measures when corruption is the evil feared." 103 S.Ct. at 560. In plaintiff's submission, then, the mere proffer of an anti-corruption justification for section 9012(f) provides a satisfactory rationale for its existence.

Taken literally the Supreme Court's opinion in *NRWC* might be construed as precluding us from independently examining whether section 9012(f) is needed to stop corruption. We are confident, however, that the Supreme Court did not intend to so rule. Judges have a solemn obligation to strictly scrutinize the justifications offered by legislators for their statutes when, as

**35.** Indeed, even if *NRWC* overrules cases such as *Buckley v. Valeo* and *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), to the extent that those cases bar Congress from prohibiting corporate spending on election campaigns, we still have serious problems with section 9012(f), because that provision explicitly allows corporate spending. So long as the corporation is a periodical publication or an FCC regulated broadcaster or a tax-exempt organization, section 9012(f)(2) makes clear that 9012(f)(1) does not bar the corporation from spending as much as it pleases on behalf of presidential candidates. *Cf.* Powe, *Mass Speech and the Newer First Amendment,* 1982 S.Ct.Rev. 243, 268 ("If a newspaper is allowed to reach and propagandize so many read-

ers, why should citizens be prevented from banding together and trying to counter it?"). Moreover, if we were not deciding this case on first amendment grounds and if defendants had pressed the argument, we might have serious problems with the statute on equal protection grounds. We have some initial difficulty in seeing how a political committee that happens to operate a periodical publication but that makes independent expenditures in support of a presidential candidate is any more or less likely to create an appearance of corruption thereby than an organization such as NCPAC or FCM. Indeed, if Congress can limit corporate spending and Congress wished to do so in section 9012(f), it wrote a very strange statute.

here, those statutes abridge free speech. Chief Justice Burger has summarized a half-century of jurisprudence on this point well:

> Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake. In *Pennenkamp v. Florida, supra,* 328 U.S. 331, at 335 [66 S.Ct. 1029, at 1031, 90 L.Ed. 1295], Mr. Justice Reed observed that this Court is
>
> > "compelled to examine for [itself] the statements in issue and the circumstances under which they were made to see whether or not they do carry a threat of clear and present danger to the impartiality and good order of the courts or whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect."
>
> Mr. Justice Brandeis was even more pointed in his concurrence in *Whitney v. California,* 274 U.S. 357, 378–379 [47 S.Ct. 641, 649, 71 L.Ed. 1095] (1927):
>
> > "[A legislative declaration] does not preclude enquiry into the question whether, at the time and under the circumstances, the conditions existed which are essential to validity under the Federal Constitution.... Whenever the fundamental rights of free speech and assembly are alleged to have been invaded, it must remain open to a defendant to present the issue whether there actually did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the legislature."
>
> A legislature appropriately inquires into and may declare the reasons impelling

legislative action but the judicial function commands analysis of whether the specific conduct charged falls within the reach of the statute and if so whether the legislation is consonant with the Constitution. Were it otherwise, the scope of freedom of speech and of the press would be subject to legislative definition and the function of the First Amendment as a check on legislative power would be nullified.

*Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843–44, 98 S.Ct. 1535, 1543–44, 56 L.Ed.2d 1 (1978); *accord Connick v. Myers,* — U.S. ——, 103 S.Ct. 1684, 1692 n. 10, 75 L.Ed.2d 708 (1983). *See also First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (proffered anti-corruption rationale for statute limiting political contributions subject to judicial scrutiny).[36]

### (ii) *The Buckley Findings*

We do agree with the plaintiffs, however, that the *Buckley* court's perception about the inutility to the campaign of truly independent expenditures was not intended as an assertion of eternal truth, but rather was intended merely as a statement of what then appeared on the record before it. If there is new and significant evidence before this court showing that section 9012(f) prevents corruption in the form of a quid pro quo, or that it prevents the appearance of corruption, *Buckley*'s non-adjudicative fact findings would not appear to prevent us from upholding the constitutionality of section 9012(f).

### (b) *Plaintiff's Evidence*

Having established our power to examine plaintiffs' evidence concerning the existence vel non of corruption or its appearance, we now proceed to do so. Our examination is limited at this point to a review of the evidence submitted and its admissibility

---

**36.** We also believe that the court's post-*Buckley* decision in *Bellotti* sufficiently rebuts an inference that might otherwise be drawn from Justice Rehnquist's opinion in *NRWC* that the court had adopted Justice White's critique of *Buckley* and held that, because Congress has far greater expertise than cloistered judges in determining what corrupts and what does not, our scrutiny should be limited when fear of corruption is the suggested motive for legislation. It is more plausible to interpret Justice Rehnquist's comments as urging courts not to insist on excessive fine-tuning of statutes that *legitimately* stop corruption.

in light of the relevancy and hearsay rules. *See* Fed.R.Evid. 401, 403, 801, 802, 803.

### (i) *The Polls*

█ Plaintiffs offered the results of two nationwide telephone surveys as important evidence of a public perception of corruption stemming from PAC spending. The first poll they cite is one of 910 voters by the Harris organization, conducted in early April and released in late May of 1983. Harris asked voters 19 questions, each of which had the following format. "Many business, labor, and other groups have formed political action committees, or PAC's that support and give money to candidates for office. How much would you trust [a certain type of political action committee] if that group were to support and give money to a candidate for president in 1984—a great deal, somewhat, not very much, or not at all." The pollsters read this query 19 times, each time substituting the name of one of 19 types of political action committees.[37]

The results of this poll, which are set out in the margin,[38] ostensibly show distrust of political action committees. Sixty-two percent of those polled, for example, said they would "not at all" or "not very much" trust a "labor union PAC" that supported and gave money to a candidate for president in 1984. Thirty-five percent said they would trust such political committees "somewhat" or "a great deal." Fifty-six percent distrusted "a business corporation PAC." Sixty percent distrusted "NCPAC, or the National Political Conservative Committee."[39]

37. According to stipulated facts, as of July 1, 1983, there were 3,461 political committees eligible to make independent expenditures for the 1984 presidential elections. Some of the political committees are purely ideological, i.e., there is no independently existing business or labor enterprises to which they are formally or otherwise attached. Other political committees are attached to specific firms, unions, or groups of firms and unions. Noteworthy among this latter category is the beer industry's political action committee, not surprisingly denominated SIXPAC.

38. TRUST IN PACS THAT GIVE MONEY TO A PRESIDENTIAL CANDIDATE

| | A Great Deal | Some-what | Not Very Much | Not At All | Not Sure |
|---|---|---|---|---|---|
| A consumer organization PAC | 19 | 42 | 18 | 17 | 4 |
| A pro-environmental PAC | 15 | 36 | 24 | 20 | 5 |
| A pro-nuclear-freeze PAC | 12 | 31 | 25 | 26 | 6 |
| A pro-ERA, or Equal Rights Amendment, PAC | 11 | 33 | 26 | 26 | 4 |
| An anti-abortion PAC | 11 | 22 | 24 | 39 | 4 |
| A pro-gun-control PAC | 10 | 25 | 25 | 35 | 5 |
| An anti-gun control PAC | 9 | 20 | 26 | 35 | 4 |
| A pro-abortion PAC | 7 | 29 | 27 | 32 | 5 |
| An AFL–CIO PAC | 7 | 29 | 27 | 32 | 5 |
| An insurance company PAC | 7 | 28 | 29 | 32 | 4 |
| A labor union PAC | 7 | 28 | 30 | 32 | 2 |
| An oil industry PAC | 7 | 24 | 28 | 37 | 4 |
| A business corporation PAC | 6 | 34 | 30 | 26 | 4 |
| A banker's PAC | 6 | 30 | 29 | 30 | 5 |
| A pro-Moral Majority PAC | 6 | 26 | 27 | 35 | 6 |
| An anti-ERA, or Equal Rights Amendment, PAC | 5 | 23 | 30 | 37 | 5 |
| A chemical industry PAC | 5 | 21 | 32 | 36 | 6 |
| A realtors' PAC | 4 | 34 | 30 | 26 | 6 |
| NCPAC, or the National Political Conservative Committee | 4 | 28 | 32 | 28 | 8 |

39. It is not clear that the voters surveyed knew what "NCPAC or the National Political Conservative Committee" was. Indeed, we would be astonished if sixty percent of those polled could

We hold the results of this poll inadmissible on two independent grounds. First, plaintiffs submitted the polls to the defendant a scant three weeks before trial. Taking into account the need of the defendants to study the methodology of the poll and the availability of the poll results to plaintiffs well before the time at which they were proffered, their admission into evidence would be unduly prejudicial, and we held it untimely. Fed.R.Evid. 403. Alternatively, we hold the poll results to be irrelevant. The Harris poll's question focused on public trust in political action committees that supported or contributed to campaigns. But massive public distrust in *political committees* cannot save section 9012(f). Only distrust in the integrity of government engendered by the conduct proscribed by section 9012(f)'s prohibitions can save the statute. The Harris poll provides no evidence on this point.

The second poll proffered by the plaintiffs was conducted specifically for the Democratic Party by the Roper Organization. Roper telephoned a nationwide sample of 1,004 people, age 18 and up, between September 30 and October 1, 1983. The organization asked a series of five substantive questions, some of which had multiple parts.

even say what NCPAC was the abbreviation for. The survey may thus be more of a referenda on the political committee's ideology, as revealed by the poll, than on its contributions.

40. The detailed results of the poll are as follows: We are just about one year away from the 1984 Presidential election. I'd like to ask you a few questions about your opinion on how presidential campaigns should be financed.

The first question on the Roper survey went as follows: "There are a number of different kinds of people and organizations that a candidate for President might receive campaign contributions from. For each one would you tell me whether you think a candidate should be able to accept any amount he is offered, or accept no more than $1,000, or accept nothing at all from that source?" Respondents were read eight groups, which ranged from "organized gambling interests" to "ordinary citizens." In general, the public favored some restrictions on the amounts candidates could accept.[40] Fifty-four percent of those polled, for example, said that candidates should be able to accept nothing or no more than $1,000 from "ordinary citizens." Seventy percent thought they should be able to accept nothing or no more than a thousand dollars from "special issue groups like gay activists or anti-abortion groups." Sixty-five percent said they thought they should be able to accept nothing or no more than a thousand dollars from "right wing conservative groups."

Any respondent who had answered that a candidate should not be allowed to accept anything or more than a thousand dollars from any of the eight listed groups was then asked his reasons for so believing:

There are a number of different kinds of people and organizations that a candidate for President might receive campaign contributions from. (READ LIST OF GROUPS BELOW). For each one would you tell me whether you think a candidate should be able to accept any amount he is offered, or accept no more than $1,000, or accept nothing at all from that source? First is Labor Unions.

| | Any Amount | $1,000 | Nothing | D.K. |
|---|---|---|---|---|
| Labor unions | 25% | 37 | 31 | 7 |
| Business corporations | 29% | 40 | 25 | 6 |
| Ordinary citizens | 42% | 38 | 16 | 4 |
| Millionaires | 40% | 38 | 17 | 5 |
| Right wing conservative groups | 24% | 35 | 30 | 11 |
| Left wing liberal groups | 21% | 35 | 31 | 13 |
| Special issue groups like gay activists or anti-abortion groups | 22% | 32 | 38 | 8 |
| Organized gambling interests | 20% | 23 | 51 | 6 |

"[I]s it because it could give one candidate an unfair advantage over the others, or is it because it could give the contributing organization too much power and influence over the man who might be our next president, or is it because it would just put too much money into election campaigning, or what?" Respondents could give more than one answer to the question. The most popular answer (chosen by sixty percent of those asked) was that contributions greater than $1,000 gave "the contributing organization too much power and influence over the man who might be our next president." [41]

We hold the results of the first two Roper questions to be inadmissible. Their late submission did not give the defendants an adequate opportunity to examine the poll's methodology or the accuracy of its results. Fed.R.Evid. 403. Moreover, the responses to the first and second questions are irrelevant. Fed.R.Evid. 401. The first and second questions inquired into the corruptive potential of campaign *contributions.* The results show that the public agrees with the Supreme Court's analysis in *Buckley.* Contributions can corrupt. But this litigation has nothing to do with contributions. The issue is whether *independent expenditures* have the potential to corrupt or create the appearance of corruption. On that issue, Mr. Roper's first two questions are silent.

The third question on the Roper survey dealt with the influence perceived to result from private spending. Respondents were asked:

As you may know, you can check off on your tax return that you want a dollar contributed to the presidential election campaign. In 1971 a law was passed that allows a presidential candidate to choose between receiving part of these funds for his campaign, and accepting no outside funds, or trying to raise more money from outside sources and not accepting any of these Federal funds.

Suppose one candidate chose to receive these Federal funds, and the other decided to raise money from outside sources. Which candidate do you think would be *least* influenced by special interest groups—the one who got the Federal funds or the one who got the outside money, or don't you think there would be any difference.

(Emphasis in original). The plaintiffs believe the response to this question is significant. Forty-four percent of those polled said the candidate who got federal funds would be least influenced, while only 17 percent said the one who got outside money would be less influenced by special interest groups. Thirty percent said the source of funding would make no difference.

This question is similarly flawed, however, by its failure to distinguish between contributions and expenditures. It asks about the relative susceptibility to "special interest groups" of candidates accepting only federal funds and candidates "trying to raise more money from outside sources and not accepting any of these Federal funds." The latter alternative could easily be construed by many respondents as asking about candidates seeking private contributions rather than independent expenditures. Indeed, if a political committee spent money that had been raised at the direction of the candidate, the political committee might run afoul of the coordinated expenditure ban already in FECA. Above all, the question does not deal with the problem involved in this case: political committees spending money on behalf of candidates who *have accepted* federal funds. The public might well believe these candidates to be less susceptible to the entreaties of special interest groups since they already have significant funding. We thus hold the evidence to be irrelevant and inadmissible. Fed.R.Evid. 401. As with the other poll results, because of its untimely

---

**41.** Twenty percent of those asked said that they favored the restrictions because it "would just put too much money into election campaigning." Sixteen percent thought it "could give one

candidate an unfair advantage over the others." Six percent gave other responses that the Roper Organization does not specify.

submission, we also exclude it on grounds of prejudice. Fed.R.Evid. 403.

Roper then asked a question apparently relating to general support for the concept of public financing of presidential campaigns: "Which do you think is the fairer way to elect a president—by letting anyone contribute whatever they want to a candidate, or by limiting each candidate to the same number of dollars through federal financing?" Seventy-one percent of those polled thought the latter choice to be fairer. Twenty percent thought unlimited contributions were "fairer."

The public may think it fairer to all candidates to spend the same amount of money, but that belief is not relevant to whether they believe violation of section 9012(f) induces corruption. The evidence is thus not admitted.

The fifth question by the Roper organization at last makes the critical distinction between contributions to candidates and independent expenditures on behalf of a presidential candidate. It reads as follows:

> Since 1971 nearly every presidential candidate has chosen to receive Federal funds rather than raise his money from outside sources. But in recent elections some private interest groups have spent very large sums of money on television advertising to support a particular candidate. Others say it is a purely technical way of getting around the 1971 law and should be stopped. Do you think it is all right or should it be stopped?

Sixty-five percent responded that the described practice should be stopped. Twenty-five percent thought it was "all right."

The finding that 65 percent of those polled believe independent expenditures "should be stopped" is suggestive. But it is also fatally incomplete. The poll does not follow up on the question and ask why those so responding believe independent expenditures should be stopped. They might have given reasons the Supreme Court has already held in *Buckley* and *Citizens Against Rent Control* to be insufficient. Only if the plaintiffs could show that a significant proportion of those polled believe independent expenditures should be stopped *because* they create the potential for corruption or do in fact lead to corruption would the response to the fifth question be relevant. Without that follow-up question, the results are worthless,[42] and the responses must be excluded as irrelevant.

### (ii) *Patronage Appointments*

The plaintiffs and amicus Common Cause also adduce evidence that individuals who spearheaded key political committees now hold positions of importance in the Reagan administration. We now review that evidence and its admissibility.

█ Plaintiffs note press reports of ambassadorships and cabinet positions going to those who were financially helpful to the Reagan campaign in 1980. The key "evidence" submitted on this point is a photo-

---

**42.** Even if plaintiffs had asked the suggested follow-up question, we would have two additional problems with reliance on the evidence, problems that independently compel us not to admit the results of this question into evidence. First, question five is leading and argumentative. It suggests that some technical evasion of "the law" is occurring and asks whether that evasion "should be stopped." The nature of the question renders the responses unreliable as indicators of true public attitudes. Second, the question fails to distinguish between coordinated expenditures and truly independent expenditures, the latter of which are the main focus of section 9012(f). Had the pollsters rephrased the second sentence of the question to read "But in recent elections some associations have spent large sums of money to spread their own views

about the candidates by developing their own advertisements, without the help of the candidates, to support a particular candidate," the responses might have been more useful.

There are, of course, also complicated hearsay problems implicated by use of polling results. A poll is in many ways just a compilation of hearsay. The pollster recounts what each of his agents have told him that respondents have said. In some circumstances, however, the problems are not insuperable obstacles to admission of polling data. *See Pittsburgh Press Club v. United States*, 579 F.2d 751 (3d Cir.1978). Because we do not believe the polling data survives a challenge under other provisions of the Federal Rules of Evidence, we do not reach the question whether it survives under the hearsay rule.

828

copy of an article in *The New Yorker* magazine by Elizabeth Drew. *See* Drew, *Politics and Money II, The New Yorker,* Dec. 13, 1982. Drew quotes an anonymous Reagan campaign official as saying "The reason Ray Donovan is Secretary of Labor is that he was virtually the only heavy hitter in the Northeast who was raising money for Reagan between 1978 and 1980." *Id.* at 76. The hearsay rule bars the admissibility of this assertion as proof of the truth of the matter asserted. Fed.R. Evid. 801, 802. Indeed, because Ms. Drew was not called as a witness, it is double or triple hearsay not satisfying the requisites of Fed.R.Evid. 805, and includes the opinion of a person who has not been qualified to render an expert opinion on such a matter. Fed.R.Evid. 702.

 Ms. Drew further opines that the current ambassadors to Great Britain and to Denmark gave sizeable contributions (not said to be illegal) to the Reagan campaign and to the Republican National Committee prior to their appointment. "Other ambassadorial appointments," the article continues, "went to men whose only credentials appeared to be that they had been financially helpful to the Reagan effort." *Id.* at 79. Obviously, these press reports are manifestly inadmissible for the truth of the matter asserted. Fed.R.Evid. 702, 801, 802. Their relevance to this litigation concerning independent expenditures is also questionable, since it is hardly clear on this record that these individuals were "helpful" through instigating political committee expenditures or through persuading people to make campaign contributions within the law.

The plaintiffs offer a stipulation that James Edwards, a member of the steering committee of a large political committee, the Americans For Change, was appointed Secretary of Energy. They also stipulate that Peter Flanigan, the chairman of the Americans for an Effective Presidency, a conservative PAC, became a member of the President's Economic Policy Advisory Board in the Executive Office of the President. They assert that William Clements,

who was involved in the organization of the Americans for an Effective Presidency, subsequently was named to the National Bipartisan Commission on Central America and the President's Commission on Strategic Forces; that Thomas Reed, Chairman of the Expenditures Committee of the Americans for an Effective Presidency, was made a National Security Council advisor, a Special Assistant to the President, and the Vice Chairman of the President's Commission on Strategic Forces; and that Anna Chennault, a member of another conservative PAC, Americans for Change, steering committee, was named Vice Chair of the President's Export Council in the Executive Office of the Presidency. Finally, they contend that Anthony R. Dolan, brother of NCPAC's chairman, was made a Special Assistant to the President and Chief Speechwriter. Although the defendants argue that this appointment was made on the basis of merit—Dolan is a Pulitzer Prize winning author—they have stipulated to the truth of this allegation.

Most of this evidence is inadmissible because plaintiffs have provided no evidence of the appointments themselves. Even if we could take judicial notice of the appointments, however, we do not find the evidence adduced probative on the issue of corruption. Indeed, even if the plaintiffs had adduced evidence of some degree of significance on this point—they have not—we would be wary, for it is in the mainstream of American political tradition that a President appoints to high position persons with whom he is (ideologically) comfortable. Such persons have often supported the presidential candidacy financially. So long as the appointees are competent, and there is no evidence here that the challenged appointees are not, there is nothing even remotely resembling corruption involved.

(iii) *Briefings*

 Finally, as evidence of at least the appearance of corruption, plaintiffs and amicus Common Cause cite "off the record" and confidential policy briefings

being given by administration officials and cabinet officers to "major contributors" to NCPAC. Plaintiffs' evidence for this allegations comes from two photocopies of newspaper reports in a paper called *"The Sun,"* presumably *The Baltimore Sun.* While the PAC defendants have stipulated to the authenticity of the photocopies, they have not stipulated to the truth of the matters asserted therein. Because these press reports are entirely hearsay, if not hearsay within hearsay that fails to satisfy Rule 805, we cannot admit them to show that these briefings in fact occurred.

The hearsay evidence rule does not bar, however, the admissibility of these and other authenticated news reports when used to show public perceptions of corruption, rather than corruption in fact. Two factors limit the probative value of the evidence, however. The cited reports have limited circulation. Moreover, the articles cited by plaintiffs do not suggest that the "confidential briefings" received by those contributing to or controlling political committees benefited them in any way other than to massage their egos or to supply them with war stories about "the day I went to the Commerce Department." There is no evidence that the defendant PACs represent any industry group that would benefit from special administration policies. We agree with the PAC defendants that this opportunity to "grip and grin" does not constitute corruption or the appearance of corruption.

**43.** The plaintiffs cite a NCPAC "URGENT-GRAM" requesting contributions to NCPAC because "Governor Reagan has almost reached his spending limit set by Federal Election Law." The URGENTGRAM continues,

The Federal Election Law sets a limit on how much a campaign can spend. However, it sets no limit on how much individual citizens and organizations like NCPAC can spend on behalf of a candidate. As long as they are not connected to his official campaign.

They call this "independent expenditures."

This is exactly what the National Conservative Political Action Committee is going to do. Launch an "independent campaign to help Governor Reagan in the final round of primaries, as well as in the November elections."

### (iv) *The Benefits of Independent Expenditures*

Thus far we have examined plaintiffs' evidence purporting to show the existence of "quo's" stemming from independent expenditures. Plaintiffs also offer evidence, however, relating to the existence of "quids," i.e., the benefits the presidential candidate receives from the conduct banned by section 9012(f).

The plaintiffs and amicus Common Cause attempt to show, for example, that the highly computerized NCPAC "carefully targeted its pro-Reagan radio, TV, and newspaper ads to 'crucial primary states' and major cities where Reagan needed NCPAC's help." Brief of Amicus Curiae Common Cause at 13–14.[43] They also cite newspaper reports that President Reagan liked NCPAC's television program "Ronald Reagan's America" so much that he telephoned NCPAC's Chairman to congratulate him." This evidence is inadmissible, however, to show the President's appreciation of NCPAC's activities or to show any beneficial effect of NCPAC's activities. Fed.R. Evid. 801, 802.

Again the hearsay rule does not prevent this evidence from being used to show a public perception of corruption. Rule 401's demand that evidence be relevant does pose a problem, however. The plaintiffs' evidence points only to the existence of a possible quid in primary elections. But section 9012(f) does not regulate independent expenditures in primary elections; its concern is the general election, about which

Plaintiffs also cite stipulations agreed to by the PAC defendants that FCM spent $60,000 on behalf of the Reagan campaign in New Hampshire after candidate Reagan had exhausted the amount he was permitted to spend under the law. They further proffer as exhibits fund raising materials of FCM, which cite the need for money to help finance "independent expenditures" in critical primary states. They also offer as an exhibit the testimony of Robert C. Heckman, chairman of FCM, before the Federal Election Committee in which he states that these fund raising materials were created because his organization perceived that certain states would be crucial to the Reagan candidacy.

plaintiffs have produced no evidence. Nonetheless, we suppose that readers might infer from the articles that, if independent expenditures could help in primary elections when the candidate ran short of funds, they could help in the general election too. The newspaper reports thus survive barely a Rule 401 challenge.[11]

In sum, the evidence supporting an adjudicative finding of corruption or its appearance is evanescent. The polls were submitted too late and asked the wrong questions. The evidence of patronage appointments is largely inadmissible and inconclusive. The evidence of confidential briefings fails to arouse our sense of suspicion. And any adjudicative finding that independent expenditures can benefit presidential candidates in the general election would rest on the most speculative of inferences.

### (c) *Adjudicative v. Legislative Facts*

 Were the constitutionality of section 9012(f) to turn on the plaintiffs having proved in the normal way (i.e., by adducing evidence capable of supporting adjudicative findings of fact), the existence of corruption or the potential for corruption, we could return at most a "scotch verdict": not proven. Most of the evidence submitted by the plaintiffs is, as we have explained, inadmissible. That part which is admissible is only tangentially relevant and

certainly insufficient. In constitutional litigation, however, appellate courts and courts of first instance have the ability to go beyond the formal rules of evidence and examine what may be described as "legislative facts."[45] In seeking to determine the rationality of a given measure in meeting permissible goals, the court may examine scholarly articles not formally submitted or may guide its conclusions by reasonable exercise of its deductive powers. The Supreme Court's finding in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 790, 98 S.Ct. 1407, 1423, 55 L.Ed.2d 707 (1978), that the risk of corruption in ballot measure elections was minimal is a recent and apposite example of this process.[16] While this sort of "legislative factfinding" by a lower court is rightly subject to far stricter review on appeal than normal adjudicative factfinding, *see Fortin v. Darlington Little League*, 514 F.2d 344, 348–49 (1st Cir.1975), it may nonetheless serve as the basis for the judgment of a trial court.

### (i) *Potential for a Quo*

Reason does not support a conclusion that much of the conduct barred by section 9012(f), including the conduct of the PAC defendants here, would cause a reasonable person[17] to think that people or groups were being rewarded because of their ex-

---

**44.** Plaintiffs and amicus Common Cause have not submitted any scholarly research tending to show a generally positive effect of independent expenditures on the prospects of the candidate they support. Such evidence might support adjudicative or other fact findings concerning the potential of independent expenditures to corrupt.

**45.** For further perspectives on the distinction between adjudicative fact finding and "legislative" fact finding, *see, e.g.,* Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv.L.Rev. 364, 402–10 (1942); *see also Carolene Prods. Co. v. United States*, 323 U.S. 18, 28 n. 13, 65 S.Ct. 1, 6 n. 13, 89 L.Ed. 15 (1944) (citing earlier authorities).

**46.** The psychological studies relied upon in *Brown v. Board of Education*, 347 U.S. 483, 494–95, 74 S.Ct. 686, 691–92, 98 L.Ed. 873

(1964), provide another classic example of this process. *See also Frontiero v. Richardson*, 411 U.S. 677, 684–87, 93 S.Ct. 1764, 1769–70, 36 L.Ed.2d 656 (1973) (discussing abilities and roles of women on basis of contemporary understandings and scholarship).

**47.** Absent relevant and admissible polling data or other scientific evidence that might alter our perception, we believe we should use a reasonable person standard in evaluating whether press reports can give rise to a belief that corruption exists. If we were to allow the charges of journalists automatically to create a presumption that corruption exists or that people believe corruption exists, a group of writers, no matter how unlikely the tales they tell, could rescue statutes otherwise abridging the free speech of those not employed by traditional, established media outlets. This cannot be the law.

penditures on behalf of a presidential candidate.[48]

A president can give little of direct value to political committees, such as the defendants here, when those committees are detached from any organization with taxes to pay or a product or service to sell.[49] In his executive capacity, the president can suggest and help promulgate regulations with impact on businesses, but few of these will have any direct impact on political committees. The president can also use the moral and political power to influence members of Congress in their consideration of proposed legislation. Again, though, we see few ways in which the vast bulk of this legislation could affect political committees such as NCPAC and FCM. Additionally, even a president who contrived some way to assist ideological political committees in a way constituting corruption would face serious constraints: the president lives in a veritable goldfish bowl, and PAC expenditures are a matter of public record.

Notwithstanding these difficulties, the president, acting through subordinates, could influence regulations or legislation that might benefit businesses or labor organizations whose attached political committees had favored him with sizeable, effective expenditures in the past and whose future, similar efforts a first-term president might devoutly wish. Although the generality with which such regulations or legislation usually are written would generally bring into play other interests that might constrain the power of the president, essentially private legislation or private regulation is not an unheard-of phenomenon. Nor do we deny that the president could, through patronage appointments, or by private legislation or regulations, finan-

cially benefit those controlling the ideological political committees whose vast expenditures in the past might have aroused a sense of obligation. While these favors might in fact be unbiased and perfectly proper responses to real needs, when preceded by expenditures of which the president is the third party beneficiary, they may sometimes assume an air of impropriety. Consequently, there is some possibility of a quo.

### (ii) *Potential for a Quid*

It is indisputable that extremely large and professionally managed expenditures, especially ones that respond to those disclosures of campaign intelligence that seem inevitably to appear in the popular media, have the potential to benefit a presidential candidate. Such expenditures may complement the message sent by the candidate or reinforce it in areas where the candidate cannot afford to spend more. In short, the spending of these PAC defendants probably does exactly what they claim: help the man they support. That may be why so many give.[50]

Many expenditures made by political committees will, however, be used in amateurish fashion; they may produce an image contrary to that which the candidate hopes to project. Yet these feckless or harmful efforts are banned by section 9012(f)'s wholesale approach.

### (d) *"Corruption to the Statute"*

The supporters of section 9012(f) have yet another theory to uphold the constitutionality of section 9012(f): "corruption to

---

**48.** We put aside the obvious fact, discussed *supra* part IV.C.3(b)(ii), that much of what a president does and proposes will reflect the shared ideology of the president and his financial supporters.

**49.** It may also be worthwhile to observe that probably fifty percent of the independent expenditures made in a presidential campaign have almost no potential to corrupt. At least half the candidates lose the election and have no favors to bestow.

**50.** It is also possible, however, that expenditures by groups such as NCPAC whose ideology may be far from the moderate position to which most candidates ascribe, may produce "guilt by association" in the minds of moderate voters and hurt the candidate in whose name the expenditures are made. Indeed, it appears to have become a campaign strategy in some recent elections to criticize candidates for receiving support from PACs.

the statute." [51] Under this theory, section 9012(f) merely serves as a prophylactic measure capping two "loopholes" that might otherwise subvert the constitutionally permissible "broad goals" of the Fund Act and FECA. Section 9012(f) bars political committees from making any expenditures in excess of $1,000 without regard to whether those expenditures are truly coordinated. Consequently, section 9012(f) prevents political committees from making coordinated expenditures and then relying, in actions brought by the FEC under 2 U.S.C. § 441a, on the difficulty of proving coordination (particularly in the short time between expenditure and election) as a way of evading effective enforcement. Section 9012(f) also caps a possible loophole in the Fund Act in that it prevents privately raised money to overwhelm the public grant that, it is asserted, was intended "to serve as a substitute for, not a supplement to, privately raised campaign funds." Brief of Amicus Curiae Common Cause at 58. These theories (and their implicit factual assumptions) are now examined.

51. This term was first used by counsel for the FEC at oral argument. Tr. at 24. We believe it succinctly captures the essence of the arguments made.

52. The plaintiffs cite the following stipulations:
 1. Stuart Spencer, who was involved in the organization of AEP [Americans for an Effective Presidency] and who was to run its operation, subsequently worked for the official Reagan campaign. He ran Reagan's campaigns for Governor of California in 1966 and 1970 and was the national political director for the official 1976 general election campaign for the Republican Party candidate.
 2. William Clements, who was involved in the organization of AEP, served as the Chairman of the official Reagan campaign in Texas and is a member of the Republican National Committee Advisory Council on National Security and International Affairs.
 3. [Former United States Senator] Harrison Schmitt, the Chairman of AFC [Americans for Change, a political committee] was, at the same time, a member of the Republican National Committee Advisory Council on Economic Affairs and a Reagan delegate to the 1980 Republican National Convention.
 4. John Harmer, the Co-Chairman of AFC, was Ronald Reagan's former Lieutenant Governor.

As proof that section 9012(f) is needed to prevent coordinated expenditures, plaintiffs recite various events occurring during the 1980 election campaign. Plaintiffs lament that, despite a two and a half year investigation of these events by the FEC, that organization exercised its "prosecutorial discretion" not to pursue the matter further in light of the "substantial commitment of resources" that the requisite proceedings would entail.

Plaintiffs and amicus Common Cause attempt to show, for example, the existence of a "revolving door" between membership in the Reagan campaign and membership in key PACs supporting candidate Reagan.[52] They cite reports that members of the Reagan campaign and the Republican National Committee deliberately leaked political intelligence, including critical polling data, to political action committees able to aid the campaign through "independent expenditures." These disclosures, it is said, were made to the media or other intermediaries, however, (rather than directly) to

 5. Stan Huckaby, the Assistant Treasurer and Custodian of Records of AFC, was, at the same time, the Treasurer of the 1980 Republican Presidential Unity Committee, an authorized committee of Ronald Reagan, and had served as a paid consultant of the Republican National Committee. He maintained his office at the Republican National Committee headquarters.
 6. James Edwards, a member of the AFC steering committee, was, at the same time, a member of the Republican National Committee Advisory Council on Natural Resources and a Reagan delegate to the 1980 Republican National Convention.
 7. Anna Chennault, a member of the AFC steering committee, was, at the same time, a member of the Republican National Committee Advisory Committee on Fiscal Affairs, and an ex-officio member of the Republican National Committee Executive Committee.
Plaintiffs have offered press reports of other such instances of simultaneous or sequential membership in official Republican campaigns and conservative political action committees. These other reports are inadmissible as evidence, however. Fed.R.Evid. 801, 802.

prevent charges of illegal coordination.[53] Plaintiffs cite leaders that supposedly show that the independent expenditures of their organization are simply a way of evading the contribution limits contained in section 9012(a) of the Fund Act.[54]

Finally, they cite evidence that the PAC defendants and the official Reagan campaign used the same suppliers and service organizations. It is stipulated for example, that "[t]he Reagan for President Committee and the Reagan/Bush Committee as well as NCPAC and FCM employed many of the same vendors. The Reagan for President Committee employed these vendors to assist in the 1980 presidential campaign[,] while NCPAC and FCM used many of the same vendors while making independent expenditures on behalf of Ronald Reagan for president during the 1980 election." Specifically, it is stipulated that Arthur J. Finkelstein and Associates consulted and polled for both the official Reagan campaign and NCPAC. Mr. Finkelstein himself, it is agreed, was a director of NCPAC in 1979. It is also stipulated that Mediamerica, Inc., a media production and advertising firm, provided services to the official Reagan campaign and for NCPAC during overlapping periods in 1980. John T. Dolan, the head of NCPAC, and Maiselle Shortley, his sister, are stipulated to have been directors of Mediamerica. Other ties between NCPAC and Mediamerica are alleged, but are based on inadmissible hearsay.

Despite all of this evidence, however, the FEC after a lengthy investigation appar-

**53.** Unfortunately for the plaintiffs, all their evidence of such disclosures is inadmissible hearsay and thus cannot be relied upon for proof of an adjudicative fact. Thus, we rule the following evidence inadmissible. Fed.R.Evid. 801, 802.

1. A quotation from an article in *The New Yorker, see supra* page 75, saying that Senator Jesse Helms, the Honorary Chairman of the National Conservative Club, a political action committee, stated:

Well, as you may know, we have had an independent effort going on in North Carolina. The law forbids me to consult with him and it's been an awkward situation. I've had to, sort of, talk indirectly with Paul Laxalt [Mr. Reagan's campaign manager] and hope that he would pass along, uh, and I think the messages have gotten through all right.

Even if Ms. Drew's account in her *New Yorker* article could be relied upon as evidence of what Ms. Drew would call as a witness, *see* Fed.R.Evid. 803(24), it cannot be taken as evidence of what Mr. Helms really said.

2. A press report, again taken from *The New Yorker* article that Lyn Nofziger, a former Assistant to the President for Political Affairs, and a Reagan campaign official in 1980, in describing how the head of an independent committee in 1980 could have found out how to aid the Reagan campaign in 1980, said:

I wouldn't have to talk to Bill Casey [Reagan's 1980 campaign director]. I'd have a friend of mine talk to Bill Casey. I wouldn't have any problem getting that done. There's no way in the world that if I'm running an independent campaign I'm not going to get the information I need, or Dick Wirthlin's [a Reagan pollster] data or talk to the chairman of the Republican National Committee, or whatever.

Again, this is inadmissible hearsay, if not inadmissible double hearsay.

3. A statement by Paul Dietrich, a former officer of defendant FCM, that "If I really want a poll from the Republic National Committee or a campaign, I can get it. They'll leak it to me." Since this comes from the *New Yorker* article, it is inadmissible hearsay, even as a report of what Mr. Dietrich said, unless it is admissible under Fed.R.Evid. 803(24), the foundation for which has not been laid. Nor is it admissible under Fed.R. Evid. 801(d)(2)(D), because the plaintiffs have not established that the statement was made by an agent of defendant FCM "within the scope of his agency or employment [and] made during the existence of the relationship."

**54.** Plaintiffs' evidence here suffers few hearsay problems. The fund raising literature contained in the exhibits is replete with reminders that, while the official campaign is limited by federal regulations in what it can spend, "independent" expenditures are helpful and still permitted. Nonetheless, we must exclude as inadmissible hearsay the following quotation of Mr. Dietrich taken from the *New Yorker* article.

All the independent PAC's ... have a little dance [where] we dance around the law in a way that never breaks the letter but breaks the spirit of the law—but we don't agree with the law anyway.

This quotation is inadmissible as evidence of Mr. Dietrich's attitude toward the election laws or of whether section 9012(f) in fact could serve to prevent subversion of sections 9012(a) and 9012(b).

ently found itself unable even to advocate a prosecution against these PACs for making illegal coordinated expenditures. But even the clearest imaginable evidence of coordination, coupled with admissions that the FEC was not enforcing the ban on coordinated expenditures, would have only a minimal effect on our analysis of Section 9012(f). The constitutionality of that provision does not stand or fall on whether it aids enforcement of constitutional provisions of the FECA or Fund Act—drawing and quartering their violators would accomplish that goal too. Rather, the issue is whether section 9012(f) prevents enough corruption of government or sufficiently prevents the appearance of corruption that it justifies the abridgements of free speech entailed thereby. While the ability of section 9012(f) to stop otherwise-undetectable corruption via coordinated expenditures [55] may have some relevance to our analysis, it is not dispositive. "Corruption to the statute" is a theory of conditional legitimacy;

it is legitimate only insofar as it relates to corruption of government.

The second prong of the "corruption to the statute" argument—the assertion that section 9012(f) prevents private money from swamping the public grant—suffers even more seriously from the only-conditional legitimacy of that theory. The argument implicitly abstracts a "Purpose of the Fund Act"—predominant public funding—from the text of selected provisions and legislative debate, and concludes that, because section 9012(f) furthers that grand constitutional purpose, the provision must be constitutional too.[56] The fact, however, that certain purposes of Congress may, in their abstract sense, suffice to overcome otherwise existing restrictions on power, and the fact that certain statutes passed as part of a legislative scheme fairly carry out that legitimate purpose does not mean that all statutes either supposedly carrying out that purpose or supposedly ancillary to legitimate enactments are themselves legiti-

**55.** It is almost tautological to state that undetectable coordinated expenditure cannot create an appearance of corruption. We suppose, however, that the difference between legal standards of proof and popular understandings might create a situation where some unprosecuted coordination created an appearance of corruption.

**56.** Excerpts from Common Cause's amicus brief may reveal these implicit arguments.

Congress enacted the Fund Act and activated it in 1973 as a means of combatting the corrosive effect of private money on the Nation's highest elected office.
....
The legislative history fully reflects this purpose.
....
Without section 9012(f)(1), the Fund Act would fall short of achieving these compelling congressional goals.
....
Congress intended public financing to serve as a substitute for, and not a supplement to, privately raised campaign funds. Invalidating section 9012(f)(1) would defeat the congressional purpose by allowing millions of dollars in privately raised contributions to swamp the public grant.
....
The invalidation of section 9012(f)(1) would undercut the basic function of the Fund Act

and revive the evils the Fund Act was intended to eliminate.
Brief of Amicus Curiae Common Cause at 52–58.
The same sort of argument is also used by the Federal Election Commission.

The overall purpose of the Fund Act was "to reduce the deleterious influence of large contributions on our political process, to facilitate communication by candidates with the electorate, and to free candidates from the rigors of fund-raising. *See* S.Rep. No. 93–689, pp. 1–10 (1974)." *Buckley v. Valeo,* 424 U.S. at 91 [96 S.Ct. at 669].... The Supreme Court found that "public financing as a means of eliminating the improper influence of large private contributions furthers a significant governmental interest ... and Congress properly regarded public financing as an appropriate means of relieving major-party Presidential candidates of the rigors of soliciting private contributions." 424 U.S. at 96 [96 S.Ct. at 671].
Congress clearly believes section 9012(f) necessary to the success of the legislative scheme for public financing of presidential elections. To implement a system in which a candidate for president can forego private contributions and accept public financing, Congress considered controls on the expenditures of political committees necessary.
Federal Election Commission's Opening Brief on the Merits, at 5–8.

mate. Each provision must be judged on its own.

### 4. *Possible Narrowing Constructions*

Because of potential overbreadth problems with section 9012(f), we asked the litigants to suggest methods to narrow the scope of the statute. If the method for narrowing did not seriously depart from Congressional intent or create independent constitutional problems such as vagueness, it might render the remaining parts of the statute not substantially overbroad. Two theories emerged.

#### (a) *Control*

Counsel for the Democrats suggested that any overbreadth problem the court might find with the statute could be cured by refining the definition of "political committee" contained in the Fund Act. Only if the contributors to a group did not have control over how their money was spent would an association that expends money on behalf of a presidential candidate be considered a political committee.[57] Counsel suggested that this narrowing construction might cure any defects in section 9012(f) because the provision would then bar only "proxy" speech by individuals and speech by corporations, both of which counsel as-

serted to be less protected by the first amendment than the ordinary political speech of individuals.

We have three problems with this suggestion. First, there is absolutely no evidence in the legislative history that Congress intended to so limit the definition of a political committee. While we suppose we can impute to Congress a general intent not to write unconstitutional laws, and, under that theory or fiction excise anything from the statute that might otherwise render it unconstitutionally overbroad, at some point in our effort to save Congressional enactments, we do violence to its intent by leaving the nation with grossly truncated statutes that Congress might never have wanted to pass in the first place.[58]

The second problem with the "control test" proposed by the Democrats is that, even if it could be reconciled with Congressional intent, and even if it cured any overbreadth problems that might exist with the statute, the test creates a constitutional problem of its own: it leaves the statute unconstitutionally vague. *See* L. Tribe *American Constitutional Law* §§ 12–26, 12–29 (1978). We can think of no definition of "control"—certainly not one advanced by counsel [59]—that would give fair warning

57. His precise words were as follows: "The distinction that we would urge upon the Court is to define a political committee as used in 9012(f) to mean a group that solicits, collects contributions and that the contributors do not have control over how that money is spent." Tr. at 82.

58. Indeed, this theory taken to its extreme would destroy the overbreadth doctrine itself. The courts would just cut the laws back to the point at which they were constitutional.

59. The following colloquy may reveal the difficulty in formulating a concrete definition of "control."

JUDGE GILES: What do you mean by control?

MR. FEIRSON: Control is a say in how the money is going to be spent. They have some say, some control over how the money is to be spent. Obviously each contributor could not have total control, but as the situation now stands with the particular defendants that are before the Court, people simply contribute the

money and they have no control, they have no say over how the money is to be spent.

JUDGE GILES: What do you mean by how the money is to be spent? They have to say ["]we authorize the money to be spent in New Hampshire, Tennessee or Alabama?["]

MR. FEIRSON: They have no say over who—which candidates are to be supported, they have no say over what the distribution is going to be, let alone over the day-to-day operating or the day-to-day minutia[e] of how the money is to be spent.

JUDGE GILES: Well, suppose you have a PAC that is organized for purposes of expending monies on behalf of a particular candidate and the solicitation was very simple: You know who X is, what he stands for; we need your money to support that person. He is running for national office.

MR. FEIRSON: I still think that would fall within the prohibition of 9012(f).

JUDGE GILES: So, what would you advocate as the control that an individual contributor would have to have over the monies in order to escape the snare of 9012(f)?

to the individual hoping to engage in political speech of when he was subjecting himself to a jail term.[60] As the American Civil Liberties Union has written in its amicus brief:

> [The control] "standard" fails to specify where, on the continuum between a multi-million dollar media campaign funded by a nationwide committee with thousands of adherents and a political pamphlet drafted and funded jointly by a handful of like-minded neighbors, individual adherents yield enough "control" to others so that the group becomes subject to section 9012(f)'s criminal penalties. Thus, the wholly amorphous, undefinable line between "informal groups" and "political committees" previously espoused by the FEC lacks the precision and clarity required by both the First and Fifth Amendments.

Finally, even if these vagueness problems could be cured, we doubt that the proposed narrowing would excise enough of the defective portion of section 9012(f) to render the remainder not substantially overbroad. An ideological organization that solicited funds from the public but did not tell it the precise message it intended to disseminate would still be criminally liable under section 9012(f), even if the amount spent was modest and the organization was unattached to any business enterprise that might later benefit by a quo from the candidate after his election.[61]

### (b) Advisory Opinions

Amicus Common Cause suggested at oral argument that the ability and obligation of the FEC to issue advisory opinions concerning the Fund Act under 2 U.S.C. § 437f ameliorates any overbreadth problems with section 9012(f). They cite (accurately) *Martin Tractor Co. v. FEC*, 627 F.2d 375, 386 (D.C.Cir.1980), for the proposition that, where an advisory opinion mechanism exists "to reduce uncertainty or narrow the statute's reach and that means can be pursued at little risk to the rights asserted, the chill induced by facial vagueness or overbreadth is *pro tanto* reduced." (Footnote omitted). *But cf. Buckley v. Valeo*, 424 U.S. 1, 40 n. 47, 96 S.Ct. 612, 645 n. 47, 46 L.Ed.2d 659 (1976) (advisory opinions cannot cure problems where available only to some or limited number of individuals and where agency not required to issue them except within a reasonable time).

If section 9012(f) indeed suffered from vagueness, Common Cause would have a

---

MR. FEIRSON: I think they have to have a say in how the money is actually spent, and I will acknowledge to the Court that the natural result of that will be that you cannot have a group of 10,000 people who will not fall within the prohibition of 9012(f).
Tr. at 86–88.

**60.** If the FEC could draft rules clarifying the meaning of "control," vagueness problems might be reduced. Unfortunately, the FEC may have no rule making power in this area since its proposed regulations are subject to a congressional veto, a procedure that the Supreme Court has recently held unconstitutional. *See INS v. Chadha*, — U.S. —, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Process Gas Consumers Group v. Consumers Energy Council of America*, — U.S. —, 103 S.Ct. 3556, 77 L.Ed.2d 1402. Indeed, the PAC defendants have argued that, because the Fund Act contains a legislative veto provision in 26 U.S.C. § 9009(c), section 9012(f) is unconstitutional. Although we have very serious doubts about this argument, *see Chadha*, 103 S.Ct. at 2775, we decline to address it in view of our disposition of this case.

**61.** Counsel for the defendants has aptly captured the problem with the control theory.

> MR. SPARKS: ... I don't see how you can narrow the statute.
> And, Judge Giles, I will tell the Court what else I don't see. I don't see the bright line.
> We started out with some people sitting around in your living room awhile ago, Judge, and it now appears that each of them has to keep control of his money, and under one Commission advisory opinion, each of them has to go down to the "Philadelphia Inquirer" to pay for the ad. If they hire a professional, they are a political committee. Heaven forbid they hire Mr. Finkelstein [who also worked for NCPAC], about whom we have heard so much.
> Over and over, the question is, where is the bright line, and over and over the answer comes back "control," but it can't be defined. Even if it could, even it it could be, your Honors, to be consistent, to be consistent with everything that they have pled so far in this case, control won't save it.
> Tr. at 101–02.

strong point. But the statute is quite clear. All expenditures over $1,000 by political committees are illegal, with certain limited exceptions spelled out in section 9012(f)(2). The problem with section 9012(f), as we shall presently see, is that it is overbroad. And, contrary to the cited dictum from the District of Columbia Circuit's *Martin Tractor* opinion, we do not believe advisory opinions are likely to cure overbreadth. Where the statute clearly prohibits the desired speech, those desiring to participate in the political process may well believe that seeking an advisory opinion is a useless gesture, for if the agency ruled in their favor, it would be violating its Congressional mandate to enforce the law, not to rewrite it.

Our view is confirmed by the FEC's broad interpretation of section 9012(f). The FEC has held an individual to be a political committee where that person collected money to pay for jointly purchased political advertisements. Advisory Opinion 1980–26, 1 Fed.Elec.Camp.Fin.Guide (CCH) ¶ 5577. It has held a group that intended to purchase an advertisement in the *New York Times* endorsing an unidentified alternative candidate to President Carter to be a political committee. Advisory Opinion 1979–41, 1 Fed.Elec.Camp.Fin.Guide (CCH) ¶ 5247. And it has labeled as a political committee a group that discussed foreign policy and might deliver $1,000 to a favored candidate. While these advisory rulings may be perfectly proper under the statute, they suggest section 437f is not a fruitful source for a narrowing thereof.

In short, the suggested narrowing constructions of section 9012(f) do not cure its overbreadth problem. The "control" approach fails to perceive the major problem with the statute and introduces serious vagueness problems. The advisory opinion mechanism, while suitable for curing vagueness, is an inappropriate tool for alleviating overbreadth.

### D. *The Overbreadth Analysis*

Under the first amendment overbreadth doctrine, courts may strike down legislation as facially unconstitutional even where a more narrowly drafted statute, one that more precisely "articulated its burdens in terms of specific harms sought to be avoided," might legitimately proscribe some subset of the conduct or speech barred by the challenged legislation. *See* Note, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. 844, 854 (1970).[62] Where this subset of legitimately proscribable conduct or speech becomes infinitesimally small, overbreadth reaches its polar case and its method of analysis collapses into more traditional methods of facially invalidating a statute.

Section 9012(f) is a good candidate for a declaration of polar overbreadth. There has been scant evidence (much less compelling evidence adduced on this record) of even the appearance of corruption as might counter the first amendment protection to which speech by individuals, acting through the useful device of a political committee, is entitled. Based on logic and experience, and as revealed by the foregoing discussion, we have determined by way of "legislative" findings (and not adjudicative findings) that modest expenditures by political committees that are not affiliated with a business or labor organization have almost no potential to corrupt or to create the appearance of corruption in the minds of reasonable persons. As the amount expended increases, however, well beyond $1,000, and as the expenditures are increasingly subject to expert, professional guidance, the potential for benefit to the candidate increases. Still, so long as the political committees are organized for purely ideological purposes, the president can do little to reciprocate in a manner that might fairly be called corruption.

There is, however, a sufficient, though narrow, area of concern to prompt us to proceed by way of overbreadth analysis:

---

**62.** Often, this doctrine enables those whose conduct might have been legitimately proscribed by the more narrowly drafted statute nonetheless to challenge the more broadly drafted legislation.

when large expenditures are made by political committees that are affiliated with business or labor groups there is some potential of the appearance of corruption. The benefits possibly resulting from such expenditures create a sufficient motive for actions capable of being interpreted as corrupt, and, despite the scrutiny to which the president is subject, a limited opportunity exists to take such actions.·

The question before us now is whether such conduct, fairly seen as creating the appearance of corruption, constitutes so significant a part of that prohibited by section 9012(f) that the defects of that statute in barring non-threatening (and constitutionally protected) speech may be repaired on a case-by-case basis as the statute is applied or whether the judiciary must remedy the risk to the Republic by recalling the statute altogether.

Were we to focus only on that conduct that has occurred while section 9012(f) has been in force, plaintiffs would have a better (though still very weak) case that the statute is not unconstitutionally overbroad. Uncontroverted and admissible evidence shows that 70 percent of the independent expenditures made in the 1980 campaign were by political committees whose aggregate expenditures exceeded $1,000,000.[63] These large expenditures, we have acknowledged, have the greatest potential to benefit the candidate and, under some circumstances, to lay the foundation for at least the appearance of corruption. But

whether spending creates an appearance of corruption depends not only on the amount spent but also on the identity of the spender. Even large expenditures made by political committees not attached to any business or union create little appearance of corruption since there is little the president can do to benefit such committees financially. And in 1980, admissible and uncontroverted evidence shows that an overwhelming proportion of the independent expenditures made in the presidential and vice presidential campaigns came from organizations like the PAC, defendants here, organizations not formally affiliated with any business or labor group and thus scarcely capable of being financially benefitted by presidential favors. Thus, taking this last factor into account, even looking just at the conduct that has occurred, we would grant judgment for the defendants.

We believe, however, that considering only conduct that has actually occurred and determining what proportion of that conduct Congress could legitimately prohibit misses the entire point of overbreadth analysis. The first amendment overbreadth doctrine "is predicated on the sensitive nature of protected expression: 'persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression.' *Village of Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620, 634 [100 S.Ct. 826, 834,

**63.** There were some difficulties with the data on this narrow point. The parties have not provided us with information that would enable us to determine precisely what percentage of independent expenditures made by political committees in the 1980 campaigns on behalf of candidates for president or vice president (as opposed to expenditures on behalf of candidates for other federal offices) were made by political committees spending more than one million dollars. There is good reason to suspect, however, that compilation of such figures would not materially advance (and indeed might hinder) plaintiffs' cause. The parties' stipulations show that the 1980 election saw $13.7 million spent on independent expenditures on behalf of presidential and vice presidential candidates. They also show that NCPAC thus spent $2.0 million and that FCM thus spent about $2.06 million. Even assuming that the Congressional Club, another

political committee, spent all of its $4.6 million on behalf of presidential candidates and that Americans for an Effective Presidency, another political committee, did likewise in spending all of its 1.27 million, only 72% of the independent expenditures made on behalf of presidential candidates were made by political committees that expended more than one million dollars. This figure could increase to as much as 85%, however, if it were assumed that all of the $1.9 million in independent expenditures made by individuals or other groups (not political committees) were made on behalf of presidential and vice presidential candidates, and if this $1.9 million was thus subtracted from the $13.7 million spent overall in such races. For the reasons set forth in the text, however, these details are not particularly relevant.

63 L.Ed.2d 73] ...; *Gooding v. Wilson,* 405 U.S. 518, 521 [92 S.Ct. 1103, 1105, 31 L.Ed.2d 408] ... (1972)." *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982). Consequently, in judging whether a statute abridging first amendment freedoms is unconstitutionally overbroad, the court must not make its decision on the basis of what conduct has occurred since the statute's enactment, rather it must consider what conduct would have occurred if the statute did not exist. Having undertaken this admittedly difficult process, the court should then consider what proportion of that conduct the Congress could legitimately prohibit.[64] If Congress could not constitutionally prohibit a substantial proportion of that conduct, the statute must fall.

Under the method of analysis we believe appropriate in first amendment overbreadth cases, section 9012(f) must fall. Almost all of the conduct it prohibits is protected by the first amendment. The statute bars several friends from associating, drafting an advertisement supporting the election of a major presidential candidate for reasons of their own, and then soliciting funds from other persons to help pay for the ad. There is little potential for corruption stemming from such conduct, yet the statute prohibits it. Similarly, the statute bars larger organizations from expressing their own reasons for endorsing or denouncing a presidential candidate—reasons that the major parties may think it more politic not to bring up. So long as the expenditures are not mammoth in relation to the money already available to the candidate—the parties agree that in 1984 some $40 million will be given to the publicly funded candidates—and so long as the organization is detached from any organization with an independent economic existence, there is little danger of corruption. Yet the statute bars this conduct as well.

Nor can it be argued that without section 9012(f) we would see more of the type of expenditures to be feared most—those by political committees attached to businesses and unions. 2 U.S.C. § 441b(b)(4), the constitutionality of which has already been upheld in the *NRWC* case, already thwarts any such threat to our polity. That provision bars corporate political committees from soliciting contributions from persons other than its stockholders, executive and administrative personnel. It also bars union political committees from collecting sums other than from current union members. But few of these individuals are likely to contribute vast sums to corporate or union political committees. Even a stockholder or union member who believed that an independent expenditure by his corporation (or union) might benefit him financially would likely not contribute much since the political committee could make almost the same expenditure without his marginal aid. Putting aside this free rider problem, the small stockholder's interest in the financial well being of the corporation (and the union member's interest in the financial well being of the union) is generally so small that even a small contribution—say on the order of $50—would not likely produce a presidential favor so large that it would benefit him financially. As for executive and other officers (or large stockholders), their number is generally so small that the $5,000 limit on individual contributions prevents them from providing a source of large sums of money to the political committees of their corporations or unions. In sum, section 9012(f) deters protected speech without potential to corrupt and is largely unnecessary to prevent protected speech conceivably capable of creating the appearance of corruption.

## V. CONCLUSION

The defendants in these actions have identified the critical vice of section 9012(f): were it not repugnant to the Constitution, it would give the institutionalized political

---

64. Our belief that we should not focus exclusively on the events that have occurred does not allow us, of course, to strike down a statute on the basis of remote contingencies. *See Ferber,* 103 S.Ct. at 3348. Nonetheless, we believe reasonable and informed speculation is permissible.

parties an almost impervious monopoly over the agenda and terms of debate in presidential electoral campaigns. Were we to give our blessing to the law examined in these actions, we would be permitting only those few with control over our major political parties, our institutionalized press,[65] or with vast individual resources, to capture the economies of scale inherent in our national society and thus to be heard above the din of everyday existence. Where the threat of corruption is so minimal, we cannot so abnegate our responsibilities.

Having concluded that section 9012(f) of title 26 of the United States Code abridges speech and association protected by the first amendment, and that section 9012(f) is substantially overbroad, and having failed to find a permissible narrowing construction to cure the overbreadth, we can reach but one conclusion. Plaintiffs in these two actions are not entitled to a declaration that section 9012(f) is not unconstitutional on its face. Our judgment must be for the defendants.[66]

---

**65.** *See supra* page 822 & note 35.

**66.** Our disposition with respect to the facial constitutionality of section 9012(f) forecloses the possibility of our granting other relief sought by the FEC in its action: a declaratory judgment that section 9012(f) could be constitu-

tionally applied to the PAC defendants in these cases. Defendants have not filed a counterclaim asking that the statute be declared unconstitutional. Consequently, we issue no such declaration.